Robert W. MATTHEWS, as Trustee in Bankruptcy of Beard & Company, Inc., Plaintiff-Appellant,

v.

JAMES TALCOTT, INC., Defendant-Appellee.

No. 14745.

United States Court of Appeals Seventh Circuit.

April 30, 1965.

Rehearing Denied June 15, 1965.

**376**

Donald A. Schabel, C. Severin Buschmann, Jr., Indianapolis, Ind., Buschmann, Carr, Schabel & Tabbert, Indianapolis, Ind., of counsel, for appellant.

Charles B. Feibleman, Gene E. Wilkins, Indianapolis, Ind., Bamberger & Feibleman, Indianapolis, Ind., of counsel, for appellee.

Before SCHNACKENBERG, KILEY and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

This is an appeal from a judgment in favor of defendant James Talcott, Inc. in a plenary action brought by the trustee in bankruptcy of Beard & Company, Inc., an Indiana corporation.

Beard & Company had conducted a lumber business in Indianapolis for a number of years before it was adjudicated a bankrupt on October 15, 1962, following the filing of a creditors' petition in involuntary bankruptcy.

James Talcott, Inc., a New York corporation, with a principal office in Chicago, claimed rights as a secured creditor in all of the inventory, accounts receivable, and machinery and equipment. The inventory consisted of lumber and mouldings. Talcott had advanced money to Beard & Company, Inc., under a factor's lien agreement dated October 5, 1960, and on the security of warehouse receipts issued by a company known as Douglas-Guardian Warehouse Corporation. At the time of the bankruptcy, the total amount owed by Beard & Company to Talcott was $512,785.46.[1]

Talcott received word about September 25, 1962, that Beard & Company had issued credit memoranda in the approximate sum of $200,000 against various accounts receivable. An investigation disclosed that certain of the accounts were fictitious. On September 27, 1962, Talcott took physical possession of all merchandise covered by its lien agreement. The following day the involuntary bankruptcy petition was filed.

Following the appointment of a trustee, the physical assets of the bankrupt were sold by the trustee with the approval of the district court. The net proceeds were turned over to Talcott under an agreement that if the trustee questioned the validity of the secured obligations claimed by Talcott, a plenary action might be filed. That is the genesis of the instant action.

Five issues were presented to the district court for decision: (1) whether designations of lumber inventory made within four months prior to bankruptcy were voidable preferences under section 60 of the Bankruptcy Act, 11 U.S.C. § 96; (2) whether the bankrupt's inventory of wood mouldings was subject to the factor's lien; (3) whether warehouse re-

---

1. This sum included loans against the following types of collateral:

| | |
|---|---|
| Accounts Receivable | $388,659.12 |
| Factor's Lien | 54,500.00 |
| Warehouse Receipts | 55,626.34 |
| Chattel Mortgage | 14,000.00 |

ceipts held by Talcott covering lumber deposited in a field warehouse located on the bankrupt's premises were valid; (4) whether accounts receivable assigned by the bankrupt to Talcott within ten days of bankruptcy and growing out of sale of lumber covered by the factor's lien constituted voidable preferences; and (5) whether a chattel mortgage held by Talcott covered leasehold improvements and other items of equipment.

The district court entered findings of fact and conclusions of law, deciding in favor of Talcott on all issues. From the judgment this appeal was taken.

A general description of the arrangements by which Beard & Company secured financing from Talcott will now be stated. Additional details, however, will be considered when we treat the separate issues.

Prior to October, 1960, the bankrupt factored its accounts receivable with a lending company known as Walter E. Heller & Company. It also obtained inventory financing from that company on the security of warehouse receipts issued by Douglas-Guardian. In connection with the latter financing, the bankrupt sublet to Douglas-Guardian its entire lumber yard storage area on its premises.

On October 5, 1960, the bankrupt entered into a financing plan with Talcott to replace its arrangement with Heller & Company. The new arrangement contemplated financing by Talcott to the bankrupt secured by four types of security devices:

(1) The bankrupt agreed to assign to Talcott all of its accounts receivable then existing or thereafter created as security for loans and advances made or to be made by Talcott for the account of the bankrupt. Talcott agreed that at the time of assignment of receivables it would advance to the bankrupt, at Talcott's discretion, a sum not exceeding eighty-five per cent of the net amount of receivables, less the agreed charge for interest. In practice, the bankrupt sent Talcott a daily schedule of assigned receivables listing the name and address of each account debtor, invoice date and number, and gross invoice amount.

(2) The bankrupt also agreed that for all of the advances made by Talcott the latter would have a continuing general lien upon all goods and merchandise from time to time designated, consigned to, or pledged with Talcott, by the bankrupt, whether or not in Talcott's constructive, actual, or exclusive possession, and regardless of whether or not such goods and merchandise was in existence on October 5, 1960, or should come into existence subsequently thereto, or should subsequently thereto be acquired by the bankrupt, and upon any accounts receivable or other proceeds resulting from the sale or other disposition of such goods and merchandise. Notice of this lien was filed by Talcott on October 5, 1960, in the office of the Recorder of Marion County, Indiana, pursuant to the provisions of the Indiana Factor's Lien Act, Burns Ind.Stat.Ann. §§ 43–1201 to 43–1210 (1963 Supp.)[2] Commencing in October, 1960, the bankrupt periodically executed and delivered consecutively numbered written designations of lumber being subjected to this continuing general lien. The designations listed the total dollar amount of lumber covered thereby and had attached the invoices of the suppliers containing specific descriptions of the lumber. In practice, all purchases of lumber by the bankrupt not placed in the field warehouse were included in designations under the factor's lien. In addition, the bankrupt would usually write a monthly letter to Talcott setting forth the dollar amount of mouldings shown by the perpetual inventory records of the bankrupt but containing no specific description of the mouldings. Various amounts were loaned by the defendant to the bankrupt on the security of the inventory of lumber and mouldings covered by the factor's lien.

(3) The bankrupt also agreed that all loans and advances theretofore or thereafter made for its account and all other amounts owed by it to Talcott should be

---

2.  The act was repealed by Indiana Acts 1963, ch. 317, § 10–102.

secured by a pledge to Talcott of goods and merchandise deposited in field warehouses acceptable to Talcott under agreements between the bankrupt and such warehouses pursuant to which negotiable or nonnegotiable warehouse receipts for such goods and merchandise should be issued. Pursuant to the agreement, Talcott approved the use of the field warehouse operated by Douglas-Guardian. The bankrupt purported from time to time to place lumber in this field warehouse, and Douglas-Guardian issued nonnegotiable warehouse receipts therefor in the name of Talcott. Talcott would lend the bankrupt amounts equal to 66⅔ per cent of the cost of the lumber evidenced by such receipts.

(4) On October 17, 1960, the bankrupt executed to Talcott a chattel mortgage on certain described machinery, equipment, office furniture, and fixtures owned by the bankrupt. The chattel mortgage secured a loan by Talcott to the bankrupt in the sum of $25,000, payable in twenty-two monthly installments of $500 each, commencing on November 15, 1960, and a final installment of $13,500 payable on October 15, 1962.

## I.

Between October 13, 1960, and September 27, 1962, the bankrupt delivered to Talcott twenty-five separate designations of lumber inventory. Each described the lumber thereby designated. Invoices directed to the bankrupt were attached. The trustee did not question the validity of the last four designations made within four months prior to bankruptcy, but attacked them as preferential and voidable. These designations, dated respectively June 6, 1962, July 24, 1962, August 28, 1962, and September 27, 1962, had an aggregate value of $193,751.03.

The district court ruled that the four designations, although made within the four-month period prior to bankruptcy,

did not constitute preferences under section 60, sub. a of the Bankruptcy Act because "the designations of merchandise related back to October 5, 1960, when the Notice of Factor's Lien was filed by Talcott."

To determine when a transfer has been perfected under section 60, sub. a, the law of the state where the transaction takes place must be consulted. McKenzie v. Irving Trust Co., 323 U.S. 365, 65 S.Ct. 405, 89 L.Ed. 305 (1945). The Indiana Factor's Lien Act gives a continuing lien upon the merchandise of the borrower as designated in separate written statements "dated and signed by the borrower and delivered to the factor." The act further provides that the lien shall cover "accounts receivable or other proceeds resulting from the sale or other disposition of any such merchandise."

The trustee contends that although the Indiana statute attempts to relate the effectiveness of the lien back to the date when notice of the factoring agreement was filed,[3] the lien does not attach to specific merchandise until such merchandise is designated. He further argues that a literal interpretation of sections 60 and 1(30) of the Bankruptcy Act, 11 U.S.C. §§ 96, 1(30), indicates that a separate transfer under these provisions occurs whenever a borrower acquires rights in new collateral since a creditor cannot acquire an interest in the goods before the borrower does.

Talcott, on the other hand, contends that the Indiana legislature anticipated the problem of an attempted avoidance by a trustee in bankruptcy of a factor's lien on inventory designated within four months prior to bankruptcy by specifically providing that the lien attachment to after-acquired property relates back to the time the notice was filed rather than to the time when the property was actually acquired by the borrower or designated by him under the lien agreement. De-

---

3. Section 43–1202 Burns Ind.Stat.Ann. (1963 Supp.) reads in pertinent part: "Such lien shall be valid from the time of filing the notice * * *, whether such merchandise shall be in existence * * * at the time of filing such notice or shall come into existence subsequently thereto or shall subsequently thereto be acquired by the borrower."

fendant concludes by arguing that the language of the Indiana statute must be given literal meaning in accordance with the holding in McKenzie v. Irving Trust Co., supra.

Even if we were to agree with the trustee that the challenged designations constituted transfers within the meaning of section 60, sub. a, we would be constrained to hold that they were not voidable preferences. The district court found that Talcott had made loans to Beard & Company "down to and including September 26, 1962." We are satisfied that this finding is not erroneous. The record shows that from June 6, 1962, through September 26, 1962, Talcott advanced Beard & Company the sum of $591,264.63 on what was purported to be valid accounts receivable. Approximately $220,000 of these accounts were spurious, having been created through a system of duplicate invoicing of retail sales by the bankrupt. Thus, Talcott was induced to advance loans on security which was nonexistent except for the designations of lumber inventory which were made during the four-month period. The factor's lien agreement contained a cross-collateral clause whereby Talcott was given a continuing general lien on inventory, for the "amount due upon any notes or other obligations given to or received by you [Talcott] for or upon account of any such loans or advances * * * no matter how or when arising and whether under the factoring agreement * * * or otherwise." Under this clause the designations in question became security for advancements secured by accounts receivable, purportedly valid but actually fictitious, in the approximate amount of $220,000. It is clear, therefore, that the designations were not made for or on account of an antecedent debt as required by section 60 of the Bankruptcy Act, but constructively, at least, represented security for loans made during the critical four-month period. Accordingly, the designations did not constitute preferences within the meaning of section 60 of the act.

## II.

To designate raw materials, work in process, finished goods, and wood mouldings as security under the factor's lien agreement, the bankrupt on October 5, 1960, delivered a letter to Talcott designating by dollar amount its existing stock of wood mouldings subject to Talcott's factor's lien. Twenty-one similar letters were sent by the bankrupt to Talcott between October 31, 1960, and August 6, 1962. The last letter showed wood mouldings on hand on July 31, 1962, having a value of $126,297.18.

The district court found that the designations of wood mouldings of the bankrupt's inventory were sufficiently complete "so that any creditor seeing the recorded Notice of Factor's Lien and making inquiry either of Beard or Talcott as to what merchandise was subject to said Factor's Lien, could have been fully advised." The district court also found that although a spot check of the perpetual inventory records made after bankruptcy "showed some discrepancies in actual physical count of the merchandise, there were approximately as many overages as shortages." We conclude that these findings are not erroneous.

The periodic letters designated the bankrupt's entire stock of wood mouldings as subject to the factor's lien. The inventory was kept current by deducting sales and adding receipts. The balances shown by the inventory records would be priced out to obtain the dollar value of the mouldings; these amounts formed the bases of the designations. At any time, the dollar amounts could have been translated to specific mouldings subject to the factor's lien.

We are of the opinion that the written designations of wood mouldings, even though listed only in dollar amounts, were sufficiently complete so as to subject the bankrupt's stock of mouldings to the factor's lien. The fact that it would have been necessary to use parole evidence to identify the specific property secured by the lien did not affect the

validity of the designations or of the lien. This proposition is in accord with Indiana law. In Baldwin v. Boyce, 152 Ind. 46, 51 N.E. 334 (1898), it was held with regard to a chattel mortgage that "a description of the property which will enable third persons, aided by the inquiries which the instrument itself indicates or suggests, to identify the mortgaged property is sufficient." In an earlier case, Duke v. Strickland, 43 Ind. 494 (1873), the Indiana supreme court said that, "It is well settled that parole evidence is admissible to show the identity of the property mortgaged."

■ The trustee points out that even if it were to be said that the letters were sufficiently complete so as to constitute adequate designations under the lien agreement, the last letter was dated July 31, 1962, and purported to cover wood mouldings on hand at that time. The trustee contends that the inventory was reduced by sales occurring between July 31 and the date of bankruptcy and that no effort was made by the bankrupt to subject to the factor's lien the replacements added to the mouldings inventory after July 31. It is argued that Talcott had and failed to discharge the burden of establishing what part of the mouldings inventory on hand at the date of bankruptcy had been part of inventory on July 31, 1962, and what part had been acquired after that date.

The trustee brought the instant plenary action. Among his claims was the charge that the inventory of mouldings was never subjected to the factor's lien by proper written designations. Under this posture of the pleadings, it was the trustee who had the burden of proving this proposition rather than Talcott bearing the burden of disproving it.

■ We think there is an additional reason which defeats the trustee's position. The record indicates that it was the intention of Talcott and Beard & Company to subject to the factor's lien all the wood mouldings in inventory at any one time. The Notice of Lien referred to "wood mouldings." The Indiana statute does not specify how frequently

the designations must be made. In these circumstances, we do not think that each time Beard & Company sold or added mouldings to its inventory that a new designation was necessary. Business realities would make such a requirement absurd. We are in agreement with what the New Hampshire supreme court said in dealing with a similar question under the Factor's Lien Law of that state: "It seems improbable that our Legislature intended that a general store borrower, for example, must separately consign each spool of thread, can of beans or package of gum to a lender bank in order to maintain the lien." Colbath v. Mechanicks Nat'l Bank, 96 N.H. 110, 70 A.2d 608 (1950).

### III.

As noted earlier, pursuant to an agreement between Beard & Company and Talcott, lumber was placed in a field warehouse operated on Beard's property by Douglas-Guardian. Defendant held non-negotiable warehouse receipts on such lumber and claimed the proceeds from the sale of the warehoused lumber after bankruptcy. The trustee opposed the claim, contending that the warehouse receipts held by Talcott were merely "scraps of paper" giving Talcott no title to the lumber purportedly covered thereby. The trustee makes this contention on the grounds that there had never been a segregation of the warehoused lumber and that the warehouseman did not exercise proper possession and control over it.

■ Although the trustee complains of a failure to segregate the lumber covered by the warehouse receipts, there was evidence of the following. Lumber covered by these receipts was divided into lots, bundled, and tagged with stack cards placed on each bundle. When Talcott took over the warehouse receipt financing from Walter E. Heller & Company on October 5, 1960, a complete physical count of warehouse inventory was taken for Douglas-Guardian. As each succeeding bonded representative of Douglas-Guardian assumed his duties, a complete physical inventory of the warehouse lumber was taken and checked.

Merchandise was released from the warehouse only upon the issuance of specific warehouse releases. We hold that these procedures constituted a sufficient segregation of the lumber so that the warehouse receipts were not invalid for any deficiency in this regard. Burns Ind. Stat.Ann. § 67–422 requires only such separation of the warehoused goods as will permit "the identification and redelivery of the goods deposited." The method of segregation employed here met this requirement.

The trustee advances several reasons for his claim that there was a failure by Douglas-Guardian to exercise proper possession and control over the warehoused lumber. First, he says that the individuals who acted as bonded representatives of the warehouse had been employed by the bankrupt and continued to render it services. It is argued that this situation created a conflict of interest which inevitably prevented these men from exercising impartial surveillance over the warehoused lumber. The trustee further questions the security of the warehouse procedures by pointing out that access to the lumber yard could be gained by going through the main office of the bankrupt, that the fence around the yard had long been in disrepair, and that the main gate to the yard could readily be opened. The district judge found, however, that the bonded representatives were "reliable men" and that although access to the yard could be gained through the office, no truck could enter or take delivery unless the gates were unlocked by one of them. The mere fact that the bankrupt itself had access to the stored goods did not impair the warehouse receipts lien. Bostian v. Park Nat'l Bank, 226 F.2d 753 (8th Cir. 1955). The trustee argues that this rule is not applicable when there is evidence of fraud or surreptitious removal of the warehoused merchandise. Although there was some testimony that there was a shortage in the lumber, there was no finding of fraud or surreptitious removal.

After making extensive findings of fact, the judge concluded that "At all times from October 5, 1960, down to and including September 28, 1962, Douglas-Guardian had custody of and exercised dominion and control over the lumber inventory covered by warehouse receipts." Having reviewed the evidence, we hold that this finding was not erroneous and that there was sufficient evidence to warrant the conclusion that the warehouse receipts were valid as issued to cover lumber properly subjected to the control of the field warehouseman.

### IV.

Between September 19, 1962, and September 28, 1962, the bankrupt assigned to Talcott certain accounts receivable having an aggregate value of $29,783.65. During this same period, the bankrupt received an advance from Talcott on these accounts receivable in the amount of $1,300. Plaintiff contended that the difference between these two sums constituted a voidable preference and so sought return from Talcott of $28,483.65.

The Indiana Factor's Lien Act provides that when there is sale of merchandise subject to a lien, the lien attaches to the proceeds of the sale in the hands of the borrower. The district judge found that the assignments of accounts receivable here questioned by the trustee "grew out of the sale of merchandise covered by factors lien, and the lien was transferred automatically to the proceeds of sale." In effect, the court found that the assignments of these accounts receivable constituted security in substitution of lumber covered by prior designations. The trustee contests this finding of fact as not supported by a "scintilla" of evidence. Nevertheless, there was testimony by the account executive of Talcott to the effect that these accounts receivable grew out of the sale of merchandise under the factor's lien. The trustee now attacks the credibility of the witness and thereby seeks to leave the district judge's finding of fact without support. The evidence offered in this regard was undisputed. Questions of

credibility were properly resolved by the trial court and are not to be considered on appeal. Accordingly, the district judge was correct in his determination that the assignments of accounts receivable were not voidable as preferential.

## V.

As noted earlier, Talcott loaned Beard & Company $25,000 secured by a chattel mortgage. Among the physical assets sold by the trustee pursuant to orders of the bankruptcy court were certain items purportedly covered by the mortgage. The net proceeds from the sale of these items amounted to $2,488.35. This sum was turned over to Talcott. The trustee now seeks its return, claiming that the items sold were not covered by the mortgage.

The mortgage listed specific property identified as being located at the premises of the bankrupt. In addition to the specific listing of properties subject to the mortgage, the mortgage contained a blanket clause "including all small tools, dies, and all other goods and chattels of every description and kind." The instrument also covered "all stock, fixtures, tools, dies, jigs, goods, wares, merchandise and other chattels * * * now situated on the said premises or which may be hereafter acquired by and placed on the said premises by the mortgagor at any time hereafter, together with all other goods and chattels of the mortgagor"

■ The items the trustee now challenges as not specifically listed in the chattel mortgage were certain leasehold improvements, an automobile, a truck, an electric motor, an off-set press, a copying machine, and a radio music system. The district court, however, found that all of these items were covered by the blanket clause and concluded therefore that the proceeds from their sale belonged to Talcott. Although the more desirable procedure would be to describe with greater specificity the property subject to a chattel mortgage, the blanket clause here covering all property at a specified loca-

tion was sufficient to subject that property to the terms of the mortgage.

■■ laintiff argues that the leasehold improvements were not properly the subject of the chattel mortgage but rather should have been covered by a real estate mortgage. The Indiana supreme court in Lincoln Nat'l Bank & Trust Co. v. Nathan, 215 Ind. 178, 19 N.E.2d 243 (1939), held that property constituting an interest in real estate, even though possibly classed as personal, is properly mortgaged by a real estate mortgage. The court did not hold, however, that a chattel mortgage covering such an interest would not constitute a valid lien. Moreover, there has been no allegation made here that any mortgagee of the bankrupt's real estate was prejudiced by the inclusion in the chattel mortgage of the leasehold improvements thereon. In these circumstances, we hold that the district court was correct in its disposition of the proceeds from the sale of the leasehold improvements in the same fashion as its disposition of the other items covered in the blanket clause of the chattel mortgage.

The judgment is affirmed.

SCHNACKENBERG, Circuit Judge, (dissenting):

I find it necessary to dissent. The district court erred in holding that the designations under the factor's lien executed and delivered within four months of bankruptcy related back to October 5, 1960, the date the notice of factor's lien was filed. Under Burns' § 43–1202, a factor's lien does not attach to specific merchandise until such merchandise is designated in one or more written statements dated and signed by the borrower and delivered to the factor. Notwithstanding the further provision of said section that the lien thus acquired relates back to the date the notice of lien was filed, a transfer occurs under the provisions of §§ 60 and 1(30) of the Bankruptcy Act each time such a designation is made, since the factor's lien does not become so far perfected that no subse-

quent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the right of the factor until the designation is made.

If the factor's lien did not relate back to October 5, 1960, then the factor's lien obtained by the designation dated September 27, 1962, was a voidable preference on the face of the court's findings of fact. All of the elements of a voidable preference were found by the court to exist on said date. Accordingly, the plaintiff, at the very least, was entitled to recover the proceeds of the lumber covered by this designation. With respect to the factor's lien obtained by the designations dated June 6, 1962, July 24, 1962, and August 28, 1962, the plaintiff clearly established all of the elements of a voidable preference, and the court's finding that the defendant had no reasonable cause to believe the bankrupt was insolvent on said dates is clearly erroneous.

Swygert, Circuit Judge, dissented in part.