In re **BULLET JET CHARTER, INC.,**
an Illinois corporation, Debtor.

**SOFTWARE CUSTOMIZER, INC.,** a
Nevada corporation, Plaintiff,

v.

**BULLET JET CHARTER,
INC.,** Defendant.

**BULLET JET CHARTER,
INC.,** Counterplaintiff,

v.

**SOFTWARE CUSTOMIZER,
INC.,** Counterdefendant.

**Bankruptcy No. 94 B 11418.
Adv. No. 94 A 01217.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Feb. 6, 1995.

Richard Steck, Steck & Spataro, Chicago, IL, for plaintiff.

Mitchell E. Jones, Rooks Pitts and Jones, Chicago, IL, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

This Adversary proceeding relates to the bankruptcy case of Bullet Jet Charter, Inc.

("Bullet Jet" or "Debtor"), filed under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

The action arises out of a contract, executed pre-petition, for sale of an aircraft by Bullet Jet to Software. Bullet Jet did not fulfill its obligations under the contract, and Software now seeks specific performance of the contract or, in the alternative, an order for replevin under Section 2–716(1) of the Illinois Uniform Commercial Code. Bullet Jet contests the action primarily on theories (1) that the elements required under non-bankruptcy law for specific performance were not established, or (2), in the alternative and as pleaded in its counterclaim, that Bullet Jet, as debtor-in-possession, may reject the contract as executory under 11 U.S.C. § 365, or (3) that Bullet Jet may avoid the contract in its capacity as debtor-in-possession under 11 U.S.C. § 544(a)(1).

This case came on for trial upon complaint of Plaintiff Software Customizer, Inc. ("Software") and counterclaim of Debtor–Defendant Bullet Jet. The Court considered testimony and exhibits admitted into evidence and the arguments of counsel, and now makes and enters the following Findings of Fact and Conclusions of Law. For reasons stated below, judgment will be entered in favor of Software on the Complaint and against Bullet Jet on the Counterclaim.

## FINDINGS OF FACT

1. Plaintiff Software is a Nevada corporation with its principal place of business in Las Vegas, Nevada. Debtor–Defendant Bullet Jet is an Illinois corporation with its principal place of business in St. Charles, Illinois. Prior to filing bankruptcy, Bullet Jet operated an aircraft charter operation. As of the trial date, it no longer operated charters, and does not do so now.

2. This Adversary involves a controversy over an aircraft asserted by Bullet Jet to be one asset of debtor's estate in bankruptcy under Chapter 11 of the Bankruptcy Code— specifically, a 1972 Aero Commander 690 aircraft, serial number 11009, bearing FAA registration number N25BD (the "Aircraft").

3. On or about March 8, 1994 (three months before the bankruptcy filing), Bullet Jet and Software entered into a written contract for the sale of the Aircraft by Bullet Jet to Transservice International, Inc. ("Transservice") on behalf of Software, a customer of Transservice (the "Agreement"). On the same day, Transservice contracted to resell the Aircraft to Neil Barron, President of Software, on behalf of his company.

Bullet Jet makes much of the fact that there were some differences between its contract to sell and the Transservice contract to resell, but has no standing or privity to rely on the resale contract. On the other hand, Bullet Jet's agents and officers accepted Software as the ultimate purchaser and dealt with Software as the intended purchaser, as more fully found below. Software sues here with standing to enforce the Transservice contract entered into on its behalf.

4. The original agreed sale price for the Aircraft was $205,000.00. On or about April 15, 1994, the contracting parties entered into a written modification of the contract, entitled Amendment "A", which provided that the parties were to split the cost of compliance with a service bulletin issued by the Aircraft manufacturer as # 211, which was adopted by the Federal Aviation Administration ("FAA") as an Airworthiness Directive.

5. The written modification increased the purchase price of the Aircraft as set forth in the original contract by the sum of $5,000.00, raising the total sale price to $210,000.00.

6. An escrow was established with Insured Aircraft Title Service, Inc. ("Aircraft Title"), for the purpose of closing the transaction.

7. Software, as purchaser of the Aircraft, deposited $210,000.00 into escrow, as required by the modified written contract.

8. Bullet Jet deposited into the escrow an appropriately executed Aircraft Bill of Sale to effectuate sale of the Aircraft to Software and transfer of title thereto. That document never left escrow and therefore was never registered with the FAA, but the state of FAA records pertaining to title in the subject Aircraft was not established by the evidence. It was not proved that no document at all

pertaining to transfer of title to Software was ever filed with the FAA.

9. On or about April 14, 1994, the purchaser Software released $25,000.00 of its money from escrow for benefit of the seller, Bullet Jet, to pay for certain repairs contractually required of Bullet Jet to comply with the original contract or otherwise necessary for the Aircraft. Bullet Jet was short of funds and needed such funds to pay for those repairs. Bullet Jet requested such release from Software in order to use those funds to pay for such repairs, and it used the money for that purpose. Software's release of such funds by written authorization (Pl.'s Ex. 6) constituted an effective written acceptance of the Aircraft under the amended sale contract.

10. During pendency of the contract, while the Aircraft was undergoing inspections and maintenance contractually required to be performed by seller prior to delivery, Software expended sums over and above the contract price for additional maintenance items not contractually required. Bullet Jet consented to all such expenditures by Software to improve the Aircraft above contract specifications.

11. On or about May 11, 1994, the Aircraft was ready for delivery pursuant to terms of the contract as amended, Bullet Jet having performed the maintenance and inspections required by the contract to the satisfaction of the purchaser. The additional maintenance work separately ordered by Software had also been completed. Software sent its representative to Indianapolis, Indiana, to accept delivery. Software was ready, willing, and able to execute an additional written acceptance of the Aircraft, and to release the remaining sale proceeds due that were in the escrow.

12. On or about May 14, 1994, Bullet Jet as seller failed to deliver the Aircraft to Software because a third party in possession of the Aircraft refused to release it due to an unpaid maintenance bill.

13. On or about May 20, 1994, Bullet Jet demanded from Software an additional sum of $61,000.00, not provided for by contract between the parties, as a condition of delivery. The additional sum was demanded both to pay the unpaid maintenance bill owed by Bullet Jet and also to provide it with a net cash benefit that it then desired. This new demand was not based on the contract or on any right under law. Software refused to pay the additional price demanded, and Bullet Jet thereupon refused to release the Bill of Sale it had deposited into escrow.

14. The Bank of Spooner holds a claim secured by the Aircraft, which would be paid from the amount of the purchase price presently held in escrow upon delivery of the Aircraft pursuant to the contract.

15. On May 23, 1994, Software filed suit in United States District Court for the Northern District of Illinois, seeking specific performance of the contract from Bullet Jet. *Software Customizer, Inc. v. Bullet Jet Charter, Inc.*, No. 94 C 3169.

16. Two weeks later, on June 7, 1994, Bullet Jet filed its Chapter 11 bankruptcy petition. It soon ceased operations except for those directed at maintaining and selling its three aircraft (one of which is the Aircraft in question here). Bullet Jet's Plan in Chapter 11 is one of liquidation. It has no hope of reviving any operations.

17. The Aircraft is diminishing in value while it remains in Bullet Jet's possession. Bullet Jet has no means to pay for appropriate and continuing maintenance required of it except through borrowing monies for that purpose. Such borrowings were obtained for a time with consent of this Court. Nonetheless, the Aircraft is gradually diminishing in market value due to passage of time. Moreover, since the trial, Bullet Jet has conceded that an engine needs repair and has been removed. The Aircraft is not flyable for that reason and sits outside of any hangar, exposed to the winter elements. Bullet Jet presently lacks funds sufficient to fix the engine. Since the Aircraft cannot be flown, it cannot be flown for maintenance flights.

18. Bullet Jet lacks significant equity in the property, the balance of the sale price due being only about $25,000.00 in excess of the amount due the secured creditor, Bank of Spooner, based on aircraft value as more fully found hereinbelow. In light of the need

for engine repair and inability to hangar the Aircraft over the winter, Bullet Jet has no material equity in the Aircraft, if indeed it still has any equity at all.

19. The aircraft is burdensome to the estate in that it constituted a daily expense (at least through trial) for maintenance, insurance, and ramp or hangar space. The estate is further required to make payments to the secured creditor who advanced money for this purpose.

20. The Aircraft is rare in terms of its exceptional condition in all respects except for the removed engine.

21. Software, as purchaser, has no prospect to cover by purchasing an alternative aircraft. There is no realistic possibility of finding a similar or better aircraft, and no possibility to obtain replication, if replication is at all possible, without considerable expense, delay, and inconvenience.

22. Bullet Jet became insolvent before filing bankruptcy and has remained insolvent since then.

23. The fair value of the Aircraft is approximately equivalent to the price set in the contract between the parties as amended, as more fully demonstrated in additional factual findings set forth below in the Conclusions of Law.

24. Bullet Jet is in the process of liquidating all its assets through orderly sales, and the subject Aircraft is not necessary to effective reorganization in the sense of operating the Aircraft in the course of charter operations. Bullet Jet no longer operates charter flights and has no prospects of doing so.

25. Factual statements set forth in the Conclusions of Law will stand as additional Findings of Fact. Any legal conclusions set forth in the Findings of Fact will stand as additional Conclusions of Law.

## CONCLUSIONS OF LAW

### Jurisdiction

This matter is before the Court pursuant to 28 U.S.C. § 157, and is referred here under Local District Court Rule 2.33. The Court has subject matter jurisdiction under 28 U.S.C. § 1334(b), and this is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## I. SOFTWARE IS ENTITLED TO SPECIFIC PERFORMANCE AND REPLEVIN UNDER NON–BANKRUPTCY LAW

### A. Software and Debtor agreed to purchase and sale of the Aircraft.

■ On March 7, 1994, Bullet Jet executed an offer to purchase the Aircraft ("Agreement") (Pl.'s Ex. 1). Software's agent, Transservice International, Inc. ("Transservice"), executed the same document on March 8, 1994. The Agreement specifically provides that Transservice was acting "on behalf of its customer." Larry Frick ("Frick"), President of Transservice, testified that his customer was Software. Neil Baron ("Baron"), President of Software, testified that he acted on behalf of Software and that the Aircraft was to be used in his company's business. Both Frick and Baron testified that Software deposited all funds required for the purchase of the Aircraft into an escrow set up to facilitate the transaction, and that Software released funds from the escrow as required by the Agreement. Baron testified that he drafted and signed Plaintiff's Exhibit 6 in his capacity as President of Software, and that he intended that document to constitute written acceptance of the Aircraft pursuant to paragraph 4 of the Agreement (Pl.'s Ex. 1). Due to delivery of Plaintiff's Exhibit 6 to the escrow agent, $25,000.00 was paid for the benefit of Bullet Jet to maintain the Aircraft, as admitted during the testimony of Thomas Kolschowsky ("Kolschowsky"), President of Bullet Jet. Kolschowsky also admitted that Plaintiff's Exhibit 7 constituted an amendment to the Agreement (Pl.'s Ex. 1). It too was signed by Baron on behalf of Software. The foregoing testimony is found to be accurate.

The evidence establishes that the Agreement for sale of the Aircraft was entered into on behalf of Software as interested purchaser, and that Software fully performed its obligations as purchaser as provided in the Agreement. The Agreement required Software only to deposit the purchase price of

the Aircraft in escrow and cause the delivery of the money to Bullet Jet at its direction upon the happening of certain events. Software did just that. Under paragraph 4 of the Agreement, disbursement of part of the purchase price ($25,000.00) from the fully funded escrow at the written direction of Software constituted acceptance of the Aircraft, and upon such acceptance, all purchase funds became non-refundable to Software.

■ Bullet Jet's argument that Software was not the party in interest with a right to enforce the contract is contrary not only to the evidence described above, but is also contrary to the actions of the debtor. Kolschowsky signed the Amendment to the Agreement (Pl.'s Ex. 7) and, when Bullet Jet attempted to rewrite the contract by demanding an additional $61,000.00, he directed that demand by letter to Software (Pl.'s Ex. 10). When Bullet Jet filed its bankruptcy petition, it listed the Agreement as an executory contract with Software and scheduled Software as a creditor. The theory that Software lacks standing to bring this action, pleaded as Debtor's third affirmative defense, is contrary to a preponderance of the evidence. At all times mentioned in the Findings of Fact, Bullet Jet dealt with Software as the principal involved as purchaser in its sale of the Aircraft. As noted earlier, Software accepted the Aircraft. The only holdup in delivery ultimately was Bullet Jet's demand for more money.

## B. Software accepted delivery of the Aircraft.

Frick went to Indianapolis, Indiana, to receive physical delivery of the Aircraft on behalf and at the direction of Software. He examined the Aircraft and was flown in it to Janesville, Wisconsin, by Harold Marlowe ("Marlowe"), of Midwest Aircraft Management, Inc., an agent of Bullet Jet. He then told Marlowe that the Aircraft was satisfactory, and he was there to accept and receive delivery on behalf of Software. He and Marlowe went back to Indianapolis with the Aircraft for some minor mechanical adjustments in anticipation of then flying the Aircraft to the purchaser, Software, in Las Vegas, Nevada. While Frick waited in Indianapolis, a problem arose with the bill rendered to Bullet Jet for the adjustments, and the mechanic, Eagle Creek Aviation Services, Inc. ("Eagle Creek"), refused to release the plane. Frick left Indianapolis on May 15, 1994, without the Aircraft.

## C. Debtor wrongfully refused to complete the transaction.

Kolschowsky testified that, until he received the maintenance bill from Eagle Creek, he was prepared to see the Aircraft delivered to Software at the original purchase price, as amended by agreement of the parties. Bullet Jet had caused the completion of all repairs and modifications of the Aircraft required by the Agreement and had deposited the Aircraft Bill of Sale into escrow. It had only to release the Bill of Sale in order to complete the transaction. Instead, after becoming aware of the Eagle Creek bill, Kolschowsky as its President chose to demand on behalf of Bullet Jet an additional $61,000.00 from the purchaser. Kolschowsky, a lawyer, admitted that he had no contractual basis for his demand. It is found that this was simply his way of getting a profit from the deal that hindsight showed his company would not otherwise get. Also, Software had already released $25,000.00 of its money for repairs and was eager for deliver, and it is apparent that Kolschowsky thought he had leverage to pry more money from the purchaser despite lack of any right to demand it.

## D. The Uniform Commercial Code controls the right of Software to specific performance and replevin under non-bankruptcy law.

The parties agree that Illinois is the forum that provides applicable non-bankruptcy law. Software's right to obtain specific performance or replevin is governed by Section 2–716 of the Uniform Commercial Code as adopted in Illinois:

(1) Specific performance may be ordered *where the goods are unique or in other proper circumstances.*

(2) The judgment for specific performance may include such terms and conditions as to payment of the price, damages, or other relief as the court may deem just.

(3) The buyer has a right of replevin *for goods identified to the contract* if after reasonable effort he is *unable to effect cover for such goods or the circumstances reasonably indicate that such effort will be unavailing* or if the goods have been shipped under reservation and satisfaction of the security interest in them has been made or tendered.

810 ILCS 5/2–716 (1994) (Emphasis added). The right under non-bankruptcy law to both forms of relief was established by the evidence at trial.

### E. *The Aircraft is unique within the meaning of Section 2–716.*

The Aircraft involved is unique within the meaning of this provision. "The test of uniqueness under this section must be made in terms of the total situation which characterized the contract." *Uniform Commercial Code Comment,* 810 ILCS 5/2–716. Not only is the Aircraft involved in this case unique because of its long range tanks and low airframe time, but also because of the work done upon it as a result of the requirements of the contract, particularly the provisions of the contract which required inspections and a "hot section" prior to delivery. Moreover, particular maintenance performed as needed by Software, but not required by contract, made the Aircraft particularly valuable to it. Dennis Lockard ("Lockard"), an expert retained by the Plaintiff, testified persuasively that there was no similar aircraft like it on the market.

### F. *"Other proper circumstances" within the meaning of the Uniform Commercial Code warrant specific performance.*

"Other proper circumstances" under Section 2–716 also exist in that "inability to cover is strong evidence" of such circumstances. *Uniform Commercial Code Comment,* 810 ILCS 5/2–716. Lockard's testimony demonstrated that Software lacks any ability to cover for lack of possession of the Aircraft except, if at all, without considerable inconvenience, expense, and delay. The considerations applicable are discussed in *Proyectos Electronicos, S.A. v. Alper,* 37 B.R. 931 (E.D.Pa.1983), where the Court found that a contract for electronics equipment could be enforced against a seller that filed for bankruptcy relief. The Court there concluded that "other proper circumstances" existed even where cover could be obtained, since the prospect of obtaining cover and then recovering the difference in cost from the insolvent, bankrupt seller was illusory. *Id.* at 933. Assuming that Software could obtain another similar aircraft, the persuasive testimony by Lockard showed that the price difference in obtaining cover would be significant for any aircraft that might be considered comparable, even before the installation of long range tanks and without a fresh engine overhaul on at least one engine (the latter requiring additional expenses which might cost from $11,000.00 to $60,000.00). The prospect that Software could cover and be made whole is non-existent, for this debtor is insolvent, has done no real business while in bankruptcy, is incurring expenses of approximately $10,000.00 to $20,000.00 per month, and its small equity in all its claimed assets (being the Aircraft in issue and two others) is wholly insufficient to provide the full amount of the cost of cover.

Under these circumstances, Software is entitled under non-bankruptcy law to the Aircraft at the price it negotiated with Bullet Jet.

### G. *Software's right to replevin was also established.*

There is also no question that the Aircraft was identified to the contract, as required for entry of an order of replevin. 810 ILCS 5/2–716 (1994). Particular maintenance was performed on the Aircraft, both as required by contract and in addition thereto as decided by Software. In fact, the particular Aircraft was ready for delivery and was accepted by Software, both through its written direction to disburse money to Bullet Jet and by its direction to Frick on the date he went to Indianapolis and there verbally accepted delivery on behalf of Software.

## II. *DEBTOR MAY NOT REJECT THE AGREEMENT AS AN EXECUTORY CONTRACT*

The first count of the Counterclaim is a request by Bullet Jet to reject its contract for the sale of the Aircraft. The request is

improper because the contract is not executory within the meaning of 11 U.S.C. § 365.

A. *Because Software has fully performed its obligations, its contract with Debtor is not executory.*

■ While the Bankruptcy Code authorizes a debtor-in-possession,[1] subject to court approval, to assume or reject executory contracts or unexpired leases, 11 U.S.C. § 365(a), the Code does not contain a precise definition of the term "executory contract." Attempts by courts to frame such a definition have proven somewhat vexing. *Matters of Crippin,* 877 F.2d 594, 596 (7th Cir.1989) (citations omitted). The legislative history of § 365(a) offers some guidance by suggesting that an executory contract is a contract on which performance remains due to some extent on both sides.[2] Indeed, this idea of mutual obligations is a recurring theme in most decisions considering this issue. Taken literally, this definition would render virtually all agreements executory, as it is rare that an agreement does not involve unperformed obligations on either side. *In re Streets & Beard Farm Partnership,* 882 F.2d 233, 235 (7th Cir.1989). However, the Seventh Circuit Court of Appeals has narrowed this definition, holding that Congress intended § 365 to apply to contracts where *significant* unperformed obligations remain on both sides.[3] *Id.*

Software argues that, because Bullet Jet breached the contract pre-petition, the contract is not executory. Software relies on *In re Murtishi,* 55 B.R. 564 (Bankr.N.D.Ill.1985) (Eisen, J.), as primary support for its contention. *See also Matter of R.M. Cordova Int'l, Inc.,* 77 B.R. 441, 446–47 (Bankr.D.N.J.1987) (contracts not executory because breached pre-petition). In *Murtishi,* the Court held

that a debtor's pre-petition breach of a real estate contract to sell property terminated the debtor's obligations and relieved the purchaser from further performance because the purchaser had materially performed by tendering the purchase price. Software argues that *Murtishi* concluded that the contract was no longer executory because neither party could resurrect a contract breached pre-petition, nor could the debtor reject it.

■ This Court does not read *Murtishi* so broadly. Breach of a contract pre-petition by a soon-to-be debtor will not necessarily bar executory treatment of that contract in bankruptcy. Rather, a distinction must be made between a contract *breached* pre-petition and a contract *terminated* pre-petition under applicable non-bankruptcy law. *In re RLR Celestial Homes, Inc.,* 108 B.R. 36, 44–45 (Bankr.S.D.N.Y.1989); *In re W. & L. Assocs., Inc.,* 71 B.R. 962, 965 (Bankr.E.D.Pa. 1987) (and cases cited). This Court must look to relevant state law to determine the significance of any obligations remaining under a contract. *Streets & Beard Farm,* 882 F.2d at 235.

Under Illinois law, tender of payment by a purchaser "is a condition to the seller's duty to tender and complete any delivery." 810 ILCS 5/2–511(1). Tender of payment will be sufficient when made in the ordinary course of business or when made as provided by agreement of the parties. 810 ILCS 5/2–511(2). Bullet Jet and Software agreed that Software would tender payment by depositing the funds in escrow, with appropriate release instructions. Pursuant to terms of the Agreement, Software deposited the purchase price in escrow, directed disbursement from escrow of all sums due Bullet Jet and directed by Bullet Jet to be disbursed, and

---

1. 11 U.S.C. § 1107(a) gives debtor-in-possession the rights, powers and duties of a Chapter 11 trustee.

2. *See* S.Rep. No. 989, 95th Cong., 1st Sess. 58 and H.Rep. No. 595, 95th Cong., 1st Sess. 347–50 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 5844, 5963, 6303.

3. Over twenty years ago, Professor Vern Countryman formulated the now-classic definition of "executory contract." Vern Countryman, *Executory Contracts in Bankruptcy, Part I,* 47 Minn.

L.Rev. 439, 460 (1973). Under his formulation, an executory contract is "a contract under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *Id.* Professor Countryman's definition received wide acceptance by many courts, including the Seventh Circuit. *See Matter of Chicago, Rock Island & Pac. R. Co.,* 604 F.2d 1002, 1004 (7th Cir. 1979).

accepted delivery. Software fully performed its obligations to tender payment and otherwise under the contract.

Because Software satisfactorily tendered payment and accepted the Aircraft, Bullet Jet was under a duty to deliver the Aircraft. Upon failure of a seller to make delivery, the buyer may cancel the contract and recover various damages or, in proper cases, obtain specific performance or replevin. 810 ILCS 5/2–716. Thus, upon Bullet Jet's failure to deliver, Software had available to it the remedies sought by it in the Adversary and sued on by it pre-bankruptcy. Bullet Jet's failure and refusal to deliver and was dispositive, effectively terminating the Agreement pre-petition. Therefore, the Agreement cannot be treated as "executory" for bankruptcy purposes.

B. *The Aircraft's value does not exceed the price Software agreed to pay; therefore it is not in the estate's best interests to reject the contract.*

 Assuming, *arguendo*, that the Aircraft sale contract was deemed executory, this Court should not approve rejection of the contract because rejection is not in the best interest of the estate. Under § 365 of the Bankruptcy Code, a trustee or debtor-in-possession may assume or reject an executory contract "subject to the court's approval[.]" 11 U.S.C. § 365(a) (1994). Courts determining whether to approve a debtor's decision to reject an executory contract apply the "business judgment rule." *See, e.g., In re Del Grosso,* 115 B.R. 136, 138 (Bankr. N.D.Ill.1990) (Squires, J.); *Johnson v. Fairco Corp.,* 61 B.R. 317, 320 (N.D.Ill.1986) (citations omitted). Under this standard, courts should approve a debtor's decision to reject such a contract where the latter demonstrates that rejection will benefit the debtor's estate or reorganization efforts. *Id.* The bankruptcy judge should have a deferential view of the debtor's business judgment in this regard, but need not accept that judgment blindly. This Court must ascertain whether rejecting such a contract will promote the best interests of Debtor's estate, but only where the debtor acted in bad faith or grossly abused its retained managerial discretion should the decision be disturbed.

*Id.* (*citing Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043, 1046 (4th Cir.1985), *cert. denied,* 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986)); *In re First Wellington Canyon Assocs.,* 1989 WL 106838 (N.D.Ill.).

If, for sake of argument, this contract was executory, Bullet Jet has grossly abused its business discretion by seeking to reject the Agreement. Retention of the Aircraft constitutes a continuing burden upon the estate and Bullet Jet lacks any significant equity in the Aircraft. Bullet Jet has a motion pending to employ a broker to sell that Aircraft for $350,000.00 "or other price as agreed upon by debtor," on a 10% commission to the broker. That would produce $315,000.00, if the top price of $350,000.00 were obtained. No offer to purchase has been presented other than that of Software. Debtor attempted to sell the Aircraft for more than two years before filing in bankruptcy. Considering the marketing period both before and since the Software offer, only Software's contract is actually on the table after almost three years of marketing efforts to sell the Aircraft. This attempt to reject is little more than a renewed effort to pressure Software to pay more money to recoup the value of money released by it from the escrow.

Dennis Lockard, an aircraft appraiser with substantial experience in both the appraisal and brokerage of turbo-prop aircraft, testified persuasively that the wholesale value of the subject Aircraft is about $210,000.00. The purchase price that Software would pay under the Agreement, as amended (Pl.'s Ex. 6), is $210,000.00. Lockard also testified to his opinion that Debtor lacked the ability to obtain anything other than a wholesale price, although he calculated a retail value of $255,-000.00. He asserted that Debtor lacked the ability and experience in aircraft sales to obtain the retail value.

Bullet Jet relied upon C.J. Frickleton as its appraiser. Frickleton admitted that, until the contract was entered into for sale to Software, he had marketed this Aircraft at a price of $200,000.00 with Bullet Jet's agreement and with expectation that $185,000.00 would be a fair price acceptable to Bullet Jet at that time. This appraiser, also a broker

who by his testimony is a friend of the Bullet Jet's sole stockholder, admitted that this particular Aircraft would be slow to sell and had been on the market for up to two years prior to the offer from Software. Yet he did not choose for the purpose of his testimony at trial to analyze the value of the Aircraft at an inventory or wholesale price as the Aircraft Bluebook Digest (the publication on which he purported to rely) seems to indicate. Instead, he used retail values (a basis he did not use when marketing the Airplane for two years). Nor did his appraisal merely follow the valuation factors set forth in the Aircraft Bluebook Digest. Instead, he made additions to the value otherwise suggested therein. Frickleton took the position that every dollar spent by the seller (or here by the buyer!) of an aircraft to perform maintenance becomes a dollar added to the fair market value of the Aircraft. By such reasoning, he added approximately $50,000.00 to the Bluebook retail value. He thereby came up with a final value of $315,000.00, although he did state that perhaps $300,000.00 was also a fair estimation.

The assumptions underlying Frickleton's analysis are flawed. For example, the Aircraft Bluebook Digest already provides an addition for an aircraft engine with a fresh, hot section (present in this Aircraft), so Frickleton appears to have double counted the value for that improvement. Moreover, Lockard testified persuasively as to particular maintenance on the Aircraft that the mere use of new rather than used turbine wheels and stators in maintenance of the hot section is of limited importance to an aircraft buyer. Such a buyer is unlikely to own the aircraft when it reaches times for its next overhaul fifteen to twenty years in the future following purchase, and will not likely pay more than Bluebook value on account of such work. Nor is there any guarantee that the wheels and stators will not require replacement at the next overhaul, regardless of the number of cycles on them at that time. To assume any large increased value based only on new wheels and stators is speculative and not something any reasonable buyer would likely consider.

Frickleton was unable to explain persuasively either how the Aircraft became so much more valuable between the time Software made its offer that he then considered acceptable and the trial, or why he did not use an inventory or wholesale value as his starting point. If one subtracts his additions based on increased repair values from his analysis of retail value, the remaining Aircraft value is close to that suggested by Lockard. If one adds the additions to the price that Frickleton thought fair at the time of sale to Software, a fair market value comes to not much more than what Software agreed to pay (after taking into account the commission and improvements to the Aircraft made for convenience while Debtor was performing its maintenance obligations, as reflected on Exhibits 4, 8, and 9). Assuming a broker commission of $10,000.00 and with at least $6,000.00 expended for maintenance, the total cost to Software was to be about $225,000.00.

Another approach to valuation would also be reasonable. Taking the Aircraft Bluebook wholesale value (defined as the value of a market-ready aircraft) of $247,000.00, and then adding and subtracting those items upon which the two appraisers agree as legitimate for that purpose and for which they reached about the same amounts, the value of the Aircraft is found to be approximately $225,000.00. This includes neither the Lockard deduction for reputation of the Aircraft as possibly used by a drug courier (although Software contends that deduction is legitimate) nor the Frickleton additions for large maintenance items. This analysis also yields a figure close to the price Software agreed to pay. As Frickleton himself testified, the best gauge of market value is the price a ready and willing buyer is able to pay, and the only evidence of the price of a ready and willing buyer is the Agreement made between Software and Debtor following about two years of marketing efforts and almost another year since the Agreement was entered into.

It is also significant that the sale price the parties agreed upon assumed that Debtor would deliver the Aircraft with a gear overhaul, a hot section, and the completion of various inspections. These were not surprise

additions to the price, but were negotiated items. The theory of Debtor that Software may have obtained more value than it bargained for at arm's length is incorrect. First, the premise that value be based on newer or better parts used than was assumed by the parties when the Agreement is made is highly questionable. The evidence is that Debtor received a repair bill that was higher than it expected, not that the cost of the hot section was higher than the buyer Software had thought it might be.

Indeed, the sale price totalling $210,000.00 was negotiated at arm's length and indicates something close to the true value of the Aircraft. Little of material consequence has changed since the parties negotiated that price that affects an increase in the value. Therefore, the possibility that Bullet Jet could find a buyer at a higher price is minimal, and in fact it has not done so.

Based on the foregoing, the fair market value of the Aircraft is found to be between $210,000.00 (the Software purchase price) and $225,000.00 (analysis starting with the Aircraft Bluebook wholesale value). In the end, the effort of Bullet Jet to abandon the Agreement in bankruptcy is just another device to pressure Software to pay more money, not an effort to sell for more to another likely purchaser.

### C. *The Aircraft is a continuing burden to Debtor's estate.*

Even assuming *arguendo* that the value of the Aircraft is as high as $225,000.00, the burden to the estate is so great that the sale Agreement should not be rejected in any event. Many months have passed since the bankruptcy filing and yet there is no evidence that any offer, let alone a higher offer than that made by Software, existed at any point since that filing or now exists. Each month Bullet Jet incurs debt interest of at least $4,500.00 per month (as Kolschowsky first testified in June, 1994). Through trial, Bullet Jet also incurred expenses for hangaring the Aircraft of $550.00 per month, insurance cost of about $500.00 per month, plus maintenance costs including the cost of crew and fuel for regularly flying the Aircraft to keep it in good condition. Debtor was at time of trial thereby losing at least $6,000.00

a month by retaining the Aircraft. Thus far Bullet Jet has lost an amount far in excess of any possible increased value from the Software Agreement of the Aircraft and the unflyable Aircraft will depreciate in value over time.

Shortly after trial, as recently disclosed by Debtor, the Aircraft was found to be in need of engine repair. The engine was removed, and the Aircraft is being parked outside over the winter. Since that prevents maintenance flights, the Aircraft value is necessarily depreciating somewhat.

As previously noted, the Agreement in question is not subject to rejection. However, if it is rejectable under the Bankruptcy Code, this Court does not approve rejection. Software will pay the fair price it had agreed to pay for the Aircraft and relieve the estate of the burden of continuing to hold and maintain it. The requested approval of a rejection is therefore denied.

### III. *SOFTWARE'S INTEREST IS NOT SUBJECT TO AVOIDANCE POWERS*

The second count of the Counterclaim is a request by Bullet Jet to enforce the avoidance powers provided by 11 U.S.C. § 544(a)(1). Transfers of a debtor's property or interests in that property that are unperfected, or otherwise not completed at commencement of a bankruptcy case, are not effective against the trustee or a debtor-in-possession. 11 U.S.C. § 544(a) (commonly referred to as the "strongarm clause"). Under § 544(a)(1), the debtor-in-possession is given the rights and powers of an unsecured creditor levying on the debtor's property under non-bankruptcy law. Bullet Jet alleges at paragraphs nine and ten of Counterclaim Count II that it did not execute or record with the FAA a bill of sale, and therefore, under state law, Software did not perfect any rights in the Aircraft pre-bankruptcy. Bullet Jet argues that Software therefore stands in the same position as a putative judicial lienholder without notice who extended credit and reduced it to judgment as of the date of filing. Bullet Jet's pleading thereby asserts that a debtor-in-possession is not subject to constructive notice for recording due to lack

of documentation of the interest of Software in the FAA records.

■ Software denied all allegations in the Counterclaim, including those which alleged that nothing was executed by Debtor or recorded with the FAA. By reason of these denials, it became Bullet Jet's burden to prove the absence of constructive notice to a hypothetical lienholder under that provision by showing the state of the title of the Aircraft as reflected in the FAA record. *In re Davison,* 738 F.2d 931 (8th Cir.1984); *see also Matthews v. Talcott,* 345 F.2d 374 (7th Cir.), *cert. denied,* 382 U.S. 837, 86 S.Ct. 84, 15 L.Ed.2d 79 (1965); *In re Adventist Living Centers, Inc.,* 174 B.R. 505, 511 (Bankr. N.D.Ill.1994) (Sonderby, J.). Debtor failed to accomplish this at trial. Bullet Jet introduced absolutely no evidence of the state of title of the Aircraft shown by FAA records. It proved only that a bill of sale sent to the escrow agent remained in escrow throughout the transaction, so that obviously that particular document was not sent to or received by the FAA. Debtor failed to show that no other document was executed by Debtor and further failed to show that no other relevant document was recorded with the FAA. Although Software contended that FAA title records for the Aircraft reflect its interest, Software was not the party with the burden to produce evidence of that fact. The burden of proof fell upon Debtor, and it failed to meet that burden.

B. *Software's equitable ownership rights are superior to subsequent avoidance rights of a hypothetical judgment lien creditor.*

■ Assuming *arguendo* that Debtor had proven that the FAA records did not contain notice of the interest of Software, the reliance of Debtor on avoiding powers is still misplaced, for § 544(a)(1) is inapplicable to the interest of Software. Under Illinois law, Software became equitable owner of the Aircraft upon execution of the Agreement (Pl.'s Ex. 1). *Cole Taylor Bank v. Cole Taylor Bank,* 224 Ill.App.3d 696, 705, 166 Ill.Dec.

817, 586 N.E.2d 775 (1st Dist.1992). The actual lien of Software therefore predates Bullet Jet's interest as debtor-in-possession. The equitable rights of Software, being first in time, take priority over any right that might arise from the avoiding powers. Those avoidance rights are junior to the equitable ownership rights of Software that take precedence over a hypothetical judgment lien creditor under state law. *Belisle v. Plunkett,* 877 F.2d 512, 514–15 (7th Cir.1989); *Lewis v. Diethorn,* 893 F.2d 648, 650–51 (3d Cir.), *cert. denied,* 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 332 (1990).

C. *Software's equitable rights do not constitute property of the estate.*

■ To the extent Debtor retained any interest in the Aircraft on the date it filed its bankruptcy petition, it held only legal title by reason of its failure to release its bill of sale to Software. Debtor held no equitable interest in the Aircraft because it had the obligation to deliver both the Aircraft itself as well as the legal title therein to Software. By reason of 11 U.S.C. § 541(d), the equitable interest of Software in the Aircraft was not and never became the property of the bankruptcy estate on or after the bankruptcy filing. Section 541(d) provides in pertinent part:

> [p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... become property of the estate ... only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d) (1944).

The application of this provision is usually in the context of the imposition of a constructive trust, *see e.g., In re Fieldcrest Homes, Inc.,* 18 B.R. 678 (Bankr.N.D.Ill.1982) (Eisen, J.), but it applies as well to equitable interests generally. *In re Perry,* 131 B.R. 763, 768 (Bankr.D.Mass.1991). Whether or not an equitable interest is labeled a constructive trust is of no moment, nor is there any conflict between provisions of § 541(d) and § 544(a)(1) which requires judicial interpretation. *Belisle v. Plunkett,* 877 F.2d at 513–

14. Thus, the interest of Software was not and is not subject to the avoiding powers of § 544(a)(1). *Perry*, 131 B.R. at 769.

### D. *Software's interest is not subject to avoidance powers.*

Bullet Jet's argument assumes it holds a perfected judicial lien superior to the rights of Software (without evidence that Software failed to record any instrument whatsoever with the FAA). Bullet Jet argues that the failure of Software to record with the FAA the Aircraft bill of sale deposited in escrow is the only fact it needed to prove. This argument relies upon an incorrect reading of the decision of *Philko Aviation, Inc. v. Shacket,* 462 U.S. 406, 103 S.Ct. 2476, 76 L.Ed.2d 678 (1983), from which Debtor asserts that the statute requiring recording of aircraft conveyances with the FAA preempts all state law which might otherwise be applicable in the instant case.

The FAA recording statute lacks any application to the matters at issue in this case because the avoiding powers relied upon by Bullet Jet, those provided at 11 U.S.C. § 544(a)(1), give it the rights only of a putative judicial lienholder, i.e. a judgment creditor, and those limited rights are not equivalent to those of an innocent purchaser for value. *In re Bellanca Aircraft Corp.,* 56 B.R. 339 (Bankr.D.Minn.1985), *aff'd,* 850 F.2d 1275 (8th Cir.1988); *In re Air Operations, Int'l, Inc.,* 97 B.R. 843 (Bankr.W.D.N.C. 1989), *aff'd.* 989 F.2d 491 (4th Cir.1993). Both of the cited cases involve aircraft and distinguish *Philko.*

In *Bellanca,* the bankruptcy trustee sought to avoid the sale of sixteen aircraft for which aircraft bills of sale had not been recorded with the FAA at the date of the filing of the petition in bankruptcy. The court noted that in *Philko* the benefits of the recording statute had been provided to an innocent and subsequent third party who had purchased an aircraft for value, and the court refused to extend that benefit to the trustee in his capacity as an "innocent" judicial lienholder. The court reasoned that the purpose of the recording statute was to protect persons who had dealt on the faith of the FAA registry. While those persons who purchased the aircraft and provided loans se-

cured by the aircraft might routinely do so, unsecured judgment creditors did not. *Bellanca,* 56 B.R. at 376–78. The court in *Bellanca* concluded that state law governed the rights of judicial lienholders and held that the equitable rights of the purchaser were superior to any later acquired rights of the trustee. In so holding, it relied upon the applicable UCC provisions: *Id.* at 379.

> ... I am satisfied that under Article 2 of the U.C.C. [the purchaser] received, upon identification of the aircraft to the contract an interest in the aircraft superior to any interest which a judgment creditor of [the debtor] could acquire through a judicial lien.

*Id.* at 379.

The Aircraft in *Bellanca* was "identified to the contract" and, as previously noted, that is the case here.

The decision in *Air Operations Int'l* reached the same conclusion on slightly different facts. There the purchaser of an aircraft sought an order from the bankruptcy court finding that its unrecorded purchase gave it rights superior to an actual judgment creditor who had seized the aircraft under a prejudgment attachment order. During the proceedings, the trustee in bankruptcy asserted that he had rights superior to those of the unperfected purchase. The court rejected claims of both the actual creditor and the trustee as putative creditor by reason of the bankruptcy code. It awarded the aircraft to the purchaser:

> The court further concludes that the trustee has no right, title or interest in or claim to the ... plane because [the purchaser] has full ownership of the plane and the trustee, whose rights are derivative of the debtor's, has nothing more than bare legal title to the aircraft.

*Air Operations Int'l,* 97 B.R. at 850. Bare legal title is also all that Bullet Jet holds in the present case.

As in the cited cases, the right to the Aircraft at issue in this case is determined at least initially under state law, and the equitable rights of Software under Illinois law are superior to those of an after-acquired lienor.

The decisions cited by defendant involve unperfected liens of secured creditors rather than the equitable rights of a purchaser under a contract. *In re Wiggs,* 87 B.R. 57 (Bankr.S.D.Ill.1988); *In re Einoder,* 55 B.R. 319 (N.D.Ill.1985) (Ginsberg, J.). In each of those cases, a bank which failed to record its lien as required by Article 9 of the Uniform Commercial Code attempted to claim an equitable lien, and in each case the court (resorting to Illinois law) found that Illinois U.C.C. Article 9 had preempted the right to an equitable lien. While that principle may be valid with regard to secured credit, it does not apply in the context of equitable rights of a purchaser of a chattel, the rights of which are set forth in Illinois court decisions subsequent to those cases relied on by debtor. Where Article 9 cannot apply because secured credit is not involved, Illinois case authority provides equitable rights to protect purchasers. *Cole Taylor Bank v. Cole Taylor Bank,* 224 Ill.App.3d 696, 166 Ill.Dec. 817, 586 N.E.2d 775 (1st Dist.1992).

■ Illinois authority applicable to the facts here is no different than non-bankruptcy law applied in *Bellanca* or *Air Operations Int'l.* The Uniform Commercial Code enacted in each state involved those cases was the same as that enacted in Illinois, and it governed the contract of sale. The Debtor here has no greater right to the Aircraft than it did prior to filing its petition in bankruptcy. The avoiding powers do not apply to add to its pre-petition rights in these circumstances. Upon execution of the contract governing the transaction, and the Aircraft having been identified to the contract, Software obtained an equitable right to the Aircraft under state law superior to any rights of a judicial lienholder. That equitable right may not be set aside under bankruptcy law.

### CONCLUSION

Plaintiff Software is entitled to specific performance of its contract with debtor or replevin of the Aircraft to the extent Debtor has possession or control thereof. Debtor in bankruptcy is no less subject to the rights of Software than it was pre-petition. It may not reject the contract as executory. It may not avoid equitable rights of Software. Since the Aircraft at issue is unique and because the Aircraft was identified to the contract, Software is entitled to the Aircraft at the purchase price as agreed.

Accordingly, judgment will enter in favor of Software on its Complaint and against Debtor on its Counterclaim. Since title to the Aircraft will belong to Software after judgment is entered and the purchase is completed, the pending motion of Debtor-Defendant to hire a broker to sell the subject Aircraft will be denied.