**In re Theophilus GREEN, Debtor.**

**LifeUSA Insurance Company, Plaintiff,**

**v.**

**Theophilus Green, Defendant.**

**Theophilus Green, Counter–Plaintiff,**

**v.**

**LifeUSA Insurance Company, Counter–Defendant.**

**Bankruptcy No. 97 B 32525. Adversary No. 98 A 01175.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Nov. 22, 1999.

---

John D. Lien, Frank DiCastri, Foley & Lardner, Larry R. Eaton, Bruce M. Lichtcsien, Blatt, Hammesfahr & Eaton, Chicago, IL, for plaintiff.

Theophilus E. Green, Psy. D., pro se.

## MEMORANDUM OPINION

ERWIN I. KATZ, Bankruptcy Judge.

This matter comes before the Court on several motions. LifeUSA Insurance Company ("LifeUSA") filed an Amended Complaint (the "Amended Complaint") in which it seeks: (1) a declaration that a debt for premiums waived under a rider (the "Rider") to a life insurance policy (the "Policy") issued to Theophilus Green ("Green") is nondischargeable due to fraud under § 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, and (2) a declaration that an award of discovery sanctions granted to it against Green in the Circuit Court of Cook County, Illinois is nondischargeable as a debt for willful and malicious injury under § 523(a)(6). LifeUSA moves for summary judgment in its favor on the Amended Complaint and prayer for rescission. Green, a *pro se* litigant[1], moves to dismiss LifeUSA's Amended Complaint. Green also moves for summary judgment in his favor on the Amended Complaint.

---

[1] Green was represented by counsel in the bankruptcy proceedings. He only appears *pro se* in the adversary proceedings against him.

Green has filed a five-count Second Amended Counterclaim (the "Second Amended Counterclaim") against LifeUSA, seeking damages for: Breach of Contract (Count I); Tortious Interference of Contract (Count II); Filing Bad Faith Claims Before the State Court for Sanctions (Count III); Collusion and Bad Faith Claims Practices Before the Federal Court (Count IV); and Negligence (Count V). Green moves for summary judgment on the Second Amended Counterclaim. LifeUSA moves for summary judgment on the first two counts of the Counterclaim.[2] LifeUSA also moves to dismiss Counts III, IV, and V of the Counterclaim.

Green has also filed a Motion to Exclude All Medical Information Not Within the Four Corners of the Contract in Contest (the "Motion to Exclude Medical Information").

For the reasons set forth herein, the Court denies Green's Motion to Exclude Medical Information. The Court dismisses Green's Second Amended Counterclaim without prejudice for lack of subject matter jurisdiction; Green may pursue his causes of action in a court that has jurisdiction. The Court denies LifeUSA's Motion to Dismiss Counts III, IV, and V of the Second Amended Counterclaim. The Court denies Green's Motion to Dismiss LifeUSA's Amended Complaint. The Court partially grants and partially denies Green's motion for summary judgment. The Court grants LifeUSA's motion for summary judgment in part and denies LifeUSA's motion for summary judgment in part.

## I. FACTUAL BACKGROUND

This background statement has been compiled using the parties' statements of uncontested facts, pleadings, depositions, answers to interrogatories, admissions on file, and affidavits.

In 1993, Green was a licensed clinical psychologist practicing in Chicago, Illinois. He is a veteran of the United States Armed Forces, in which he served from 1965 until 1968.

In December, 1993, Green applied for a life insurance policy and rider for waiver of planned premiums (the "Rider") from LifeUSA. Alan Bloomfield ("Bloomfield"), an insurance agent, completed the application (the "Application") using information provided by Green and information contained in Green's prior insurance policy. The Application contained the following questions:

4. WITHIN THE PAST 5 YEARS HAS ANY PERSON TO BE COVERED

a. Consulted, been examined or been treated by any physician or practitioner?

5. TO THE BEST OF YOUR KNOWLEDGE, HAS ANY PERSON TO BE COVERED HAD OR BEEN TOLD HE OR SHE HAD?

a. Epilepsy, fainting spells, nervous or mental condition, neuritis, paralysis, or any disease or abnormality of the brain or nervous system?

Green answered "No" to both questions.

In the Application, Green authorized an exhaustive list of medical care providers and related entities, including any "institution or person that has any information in its records on me," to release medical and non-medical information about him to LifeUSA (the "Release"). The Application provided that the Release would be effective for two and one-half years from the Application's date. The Application provided that the statements made therein were true and complete. Green signed the Application and dated it with the month, December, and the year, 1993. Green did not indicate on which day of December, 1993 he signed the Application.

---

**2.** When LifeUSA filed its motion for summary judgment, Green's Amended Counterclaim was before the Court. Green subsequently filed the Second Amended Counterclaim, which added Counts III, IV, and V.

On December 24, 1993, Green submitted a supplemental application (the "Supplemental Application") to LifeUSA. In the Supplemental Application, LifeUSA asked Green the three questions that follow:

1. Have you ever consulted any medical practioner [sic] for, or as far as you know, ever been treated for;

 . . .

 F. Any brain or nervous system disorder, e.g., epilepsy, convulsions, fainting or loss of consciousness, mental illness, constant nervousness or severe headaches?

 . . . .

2. Have you ever:

 . . .

 G. Ever applied for or received any pension or benefits for sickness, disability or accident?

 . . . .

3. Other than previously stated, as far as you know, have you in the last 5 years:

 . . .

 C. Consulted any medical practioner [sic] for any reason (including check-ups?)

Green answered "No" to each question.

On February 23, 1994, LifeUSA issued life insurance policy number 3121971 with Green as the insured (the "Policy"). In June, 1994, Green suffered a stroke and made a claim for waiver of premiums under the Rider. Sometime thereafter, LifeUSA waived the premiums for the Policy.

LifeUSA began investigating Green's claims. Upon its request for Green's medical records, it received a letter from Dr. James R. Miller ("Miller"), in which Miller wrote that LifeUSA might have questions about "depression and whether [Green's] disability is related to a psychiatric diagnosis that may have been pre-existent before the onset of his present illness."

In the course of its investigation, LifeUSA received three letters signed by Dr. Patrick Israel ("Israel"), a psychiatrist practicing in a suburb of Chicago. In a letter dated December 9, 1994, Israel states in part:

Dr. Green has been under my professional care since 1985. Intervals of therapy have varied from weekly to monthly in frequency. His symptoms have consisted of recurring episodes of depression and anxiety.

In the past several years there has been increasing difficulty in functioning in his profession, in response to which he has progressively decreased his work hours and accepted fewer and fewer referrals of clients.

The psychotherapy has been supportive but has not altered his progressive functional impairment. He will continue to receive psychotherapy as needed.

Two later letters from Israel, dated January 26, 1995 and January 31, 1995, respectively, explain that Green was discharged from treatment on December 16, 1987. The letters further explain that eight visits from January, 1989 through the winter of 1990 were consultations about Green's practice. In August, 1990, Green "returned to discuss again problems with the mental health administration and to deal with some difficulties in family and social relationships."

During his deposition, Israel testified that, until 1994, he treated Green for depression, stress, or anxiety. In addition, Israel consulted with Green about his work. The last record Israel has of treating Green is in August, 1994. Israel explained that he diagnosed Green as suffering from dysthymia, or minor depression. Israel prescribed one hour psychotherapy sessions for him. Israel submitted claims to Green's health insurer and the claims were paid.

On September 7, 1992, Israel's billing records show that he filed a disability report with the City of Chicago, Green's then-employer, on Green's behalf. Israel further testified that on November 4, 1991,

he drafted a report to the Department of Veteran's Affairs (the "VA"). Israel sent the report because Green was seeking mental and emotional disability benefits from the VA. In the report, Israel explains:

[Green] had been in urgent need of treatment for a long time but his fear and distrust of authority, paranoid in intensity, has previously made him unable to tolerate more than an occasional visit to one or another psychiatrist to obtain medication. He was taking Chlorpromazine, 400 mg per day as needed to control episodes of severe agitation during which he feared loss of control. He worked sporadically, when his condition was in partial remission, in a semi-volunteer capacity at an alcoholism clinic.... There has been some progress in terms of a lessening of tension and longer periods of superficially adequate social appearance and vocational functioning, but the underlying paranoia and depression are constant and his surface adequacy is accomplished via intense conscious effort. He is required to keep regular control over recurring impulses to self-harm or violence toward others.... His psychopathology repeatedly interferes with his vocational efforts....

While investigating Green's claims, LifeUSA discovered that Green had been receiving disability benefits from the VA since at least 1989, based on the VA's 1968 diagnosis of Green as a paranoid schizophrenic. During his deposition, Green testified that he had been on disability from the military since 1968.

On January 14, 1994, after signing the Application but before the Policy was issued, Green submitted a Statement in Support of Claim to the VA in which he requested that the VA increase his disability benefits from the 70% level to the 100% level. He listed six hospital stays that took place over the period May, 1988 through May, 1993, which were within the five year period covered by the LifeUSA Application. In the Statement in Support of Claim, Green stated that "I am a veteran who has been disabled for more than 25 years and my doctor says I am entitled to stop frequent evaluations because he says they aggravate my condition."

On February 22, 1996, LifeUSA filed a Complaint for Rescission of Insurance Contract ("Rescission Complaint") against Green in the Circuit Court of Cook County of Illinois (the "Circuit Court"). LifeUSA based the Rescission Complaint on Green's material misrepresentation of his medical history.

In the Rescission Complaint, LifeUSA prayed for rescission of the Rider only. LifeUSA did not seek rescission of the Policy. In Paragraph 12 of its Rescission Complaint, LifeUSA alleged:

If the facts in the applications for insurance submitted to plaintiff by THEOPHILUS GREEN had correctly represented the facts of his health history, plaintiff LIFEUSA would not have issued the waiver of planned premium rider on the applied for life insurance but would have rejected said application for such rider as made.

LifeUSA tendered to Green the premiums paid for the Rider, in the total amount of $1,389.98. LifeUSA prayed only that "the aforesaid waiver of planned premium rider be rescinded and declared void...."

During the pendency of the litigation in the Circuit Court, Green requested, and obtained, from Israel his original medical treatment records. Green then ripped the cards on which Israel had kept the records into quarters. On June 17, 1997, the Circuit Court entered the following judgment for sanctions against Green:

It is hereby ordered that the Court, having had the benefit of the testimony of Dr. Green and Dr. Israel is satisfied that [LifeUSA] received all of Dr. Israel's records that they would have received, had they obtained them directly from Dr. Israel. Therefore, Dr. Green's

conduct is not sufficient to hold him in default.

It is hereby ordered that a person of Dr. Green's intelligence and experience should have known that his conduct in requesting original treating physician's records directly rather than through counsel, would at the very least, cause some detriment, inconvenience and additional labor to the plaintiffs. While Dr. Green eventually produced the torn up pieces of Dr. Israel's records, had they not been produced, [LifeUSA] would have had a serious case for spoliation of evidence. Counsel for [LifeUSA] is correct in asserting that some sanction is proper.

The Circuit Court ordered Green to pay LifeUSA $8,601.14 for fees and costs.

There is no genuine issue involving any of these material facts.

## II. BANKRUPTCY HISTORY

On October 22, 1997, Green filed a petition for relief under Chapter 13 of the Bankruptcy Code, 11 U.S.C. § 101 et seq. On March 10, 1998, the case was converted to a Chapter 7 case. The Chapter 7 trustee filed a no asset report on May 13, 1998. On August 1, 1998, Green received his discharge. The case was closed on August 7, 1998.

The bankruptcy filing, pursuant to 11 U.S.C. § 362, automatically stayed the action in the Circuit Court. LifeUSA filed the instant adversary proceeding against Green, asking the Court to allow its claims of $83,816.53 for waived premiums and $8,601.14 for the sanctions ordered by the Circuit Court. LifeUSA further seeks a declaration that the debts are nondischargeable. LifeUSA also asks that the Policy and Rider either be rescinded or deemed rejected.

Green subsequently filed a Counter-claim, an Amended Counterclaim, and a Second Amended Counterclaim, all seeking damages under various common law theories. After the no asset report was filed, the Court invited the trustee to consider whether he wished to vacate the no asset report and pursue the counter-claims on behalf of the estate.[3] After investigation, the trustee determined to take no action. The counter-claims are thus abandoned to Green.

## III. JURISDICTION

Before reaching the merits of either party's case, the Court must determine whether it has jurisdiction over the issues presented. "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3). The Court "has a duty to resolve apparent jurisdictional questions even where the parties do not raise them." *Yasuda Fire & Marine Ins. Co. of Europe, Ltd. v. Continental Casualty Co.*, 37 F.3d 345, 347 (7th Cir. 1994).

Bankruptcy jurisdiction should be interpreted narrowly. *In re FedPak Systems, Inc.*, 80 F.3d 207, 213–14 (7th Cir. 1996). The United States District Courts' bankruptcy jurisdiction extends to "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). The bankruptcy courts receive their powers by delegation or reference from the district courts pursuant to 28 U.S.C. § 157. The District Court for the Northern District of Illinois has referred all bankruptcy cases under its jurisdiction to this court. N.D. ILL. LOCAL GENERAL RULE 2.33(A). Thus, through the reference from the district court, this court has jurisdiction over matters arising under, arising in, or related to bankruptcy cases under 28 U.S.C. § 1334.

---

**3.** The filing of a no asset report constitutes an abandonment of listed, unadministered property in a debtor's bankruptcy schedules. 11 U.S.C. § 554(c). However, Green did not schedule his counter-claims and the trustee abandoned them pursuant to 11 U.S.C. §§ 554(a) and (d).

Section 157 further limits bankruptcy jurisdiction by dividing the matters which the court may hear into two categories: core and non-core. Bankruptcy courts may enter final orders and judgments, subject to appeal, in core proceedings. 28 U.S.C. § 157(b). However, in non-core proceedings a bankruptcy court must submit proposed findings of fact and conclusions of law to the district court, which has the power to enter the final order. 28 U.S.C. § 157(c). Core matters are those "arising under" title 11 or "arising in" a case under title 11. 28 U.S.C. § 157(b).

A matter "arising under" title 11 involves a cause of action created or determined by a statutory provision of title 11. *Barnett v. Stern*, 909 F.2d 973, 981 (7th Cir.1990); *Wood v. Wood (In re Wood)*, 825 F.2d 90, 96 (5th Cir.1987). A proceeding "arising in" a case under title 11 involves those administrative matters that arise only in bankruptcy cases. *Diamond Mtg. Corp. of Illinois v. Sugar*, 913 F.2d 1233, 1239 (7th Cir.1990); *Wood*, 825 F.2d at 97. "'[A]rising in' proceedings are those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." *Wood*, 825 F.2d at 97.

In its motion for summary judgment, LifeUSA asserts that the Court has core jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(C) and (b)(2)(I).[4] However, LifeUSA has oversimplified the case. There are separate components to these proceedings: (1) the dischargeability determination and (2) the causes of action set forth in Green's Second Amended Counterclaim. LifeUSA's blanket allegation of jurisdiction does not cover them both.

Section 157(b)(2)(I) provides that determinations as to the dischargeability of debts are core proceedings. 28 U.S.C. § 157(b)(2)(I). However, there is no core jurisdiction over the Second Amended

Counterclaim under § 157(b)(2)(C). That section encompasses only those counterclaims brought by the bankruptcy estate against persons filing claims against the estate. 28 U.S.C. § 157(b)(2)(C). The trustee has abandoned the causes of action set forth in the Second Amended Counterclaim and therefore, none of those causes of action are part of the bankruptcy estate. The estate did not bring the Second Amended Counterclaim; Green brought it on his own behalf. Section 157(b)(2)(C) does not apply to the Second Amended Counterclaim.

The common law causes of action set forth in Green's Second Amended counterclaim do not arise under title 11. They do not involve substantive rights created by the Bankruptcy Code. Nor do they arise in a case under title 11. They do not involve administrative matters that could arise only in a bankruptcy proceeding. Therefore, the Court has jurisdiction over them only if they are related to this bankruptcy proceeding.

Non-core matters over which bankruptcy courts have jurisdiction are those "related to" a bankruptcy case.

> The reference to cases related to bankruptcy cases is primarily intended to encompass tort, contract, and other legal claims by and against the debtor, claims that were it not for bankruptcy, would be ordinary stand-alone lawsuits between the debtor and others but that section 1334(b) allows to be forced into bankruptcy court so that all claims by and against the debtor can be determined in the same forum.

*Zerand–Bernal Group, Inc. v. Cox*, 23 F.3d 159, 161 (7th Cir.1994). Although neither the Bankruptcy Code nor the jurisdictional statutes define the term "related to," the Seventh Circuit holds that a case is "related to" a bankruptcy when it affects either the amount of property in the bank-

---

4. Green did not include a jurisdictional statement in any pleadings or motions filed with the Court.

ruptcy estate or the distribution of that property among the creditors. *FedPak*, 80 F.3d at 213–14; *Elscint, Inc. v. First Wisconsin Financial Corp. (In re Xonics, Inc.)*, 813 F.2d 127, 131 (7th Cir.1987).

When property leaves the bankruptcy estate, whether by sale or otherwise, the bankruptcy court's jurisdiction over that property lapses. *Xonics*, 813 F.2d at 131. A bankruptcy court has no jurisdiction over property that is no longer part of the bankruptcy estate. *In re Edwards*, 962 F.2d 641, 643 (7th Cir.1992). When a trustee abandons property to the debtor, there is no remaining basis for bankruptcy court jurisdiction. *In re Abma*, 215 B.R. 148, 152 (Bankr.N.D.Ill. 1997). The causes of action set forth in the Second Amended Counterclaim are not related to the bankruptcy proceeding.

In addition, while the Seventh Circuit has not yet decided the question of whether bankruptcy courts can exercise supplemental jurisdiction, it has stated that the relationship between supplemental jurisdiction under 28 U.S.C. § 1367 and "related to" proceedings in bankruptcy is "functionally identical." *Chapman v. Currie Motors, Inc.*, 65 F.3d 78, 81 (7th Cir. 1995). The general rule is that a federal court should decline to exercise supplemental jurisdiction over state law issues when the federal issues have been eliminated prior to trial. *Carr v. CIGNA Securities, Inc.*, 95 F.3d 544, 546 (7th Cir.1996); *Korzen v. Local Union 705, Int'l Brotherhood of Teamsters*, 75 F.3d 285, 288 (7th Cir.1996); *Turner v. Bowens*, No. 95 C 4530, 1997 WL 85174, at *1 (N.D.Ill. Feb. 23, 1997).

This court lacks subject matter jurisdiction over the causes of action set forth in the Second Amended Counterclaim. It dismissed without prejudice. Green may proceed against LifeUSA in the Illinois courts or in any other court that has subject matter jurisdiction.

## IV. APPLICABLE STANDARDS

Before the Court are: (1) LifeUSA's motion for summary judgment; (2) Green's motion to dismiss the Amended Complaint; (3) Green's motion for summary judgment; and (4) Green's motion to exclude medical records.

### A. Motions to Dismiss

For a defendant to prevail on a motion to dismiss, it must appear from the complaint that the plaintiff can prove no set of facts which could entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Court must assume the truth of all well-pleaded factual allegations and make all possible inferences in favor of the plaintiff. *Gorski v. Troy*, 929 F.2d 1183, 1186 (7th Cir.1991). The issue is not whether the plaintiff ultimately will prevail, but whether the plaintiff has pleaded a cause of action sufficient to entitle it to go forward with the complaint. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

Federal notice pleading standards require only that the plaintiff give the defendant fair notice of its claims and the grounds for those claims. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993), *Conley*, 355 U.S. at 47, 78 S.Ct. 99. However, mere conclusory allegations unsupported by factual assertions will not withstand a motion to dismiss. *Briscoe v. LaHue*, 663 F.2d 713 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), *cert. denied sub nom. Talley v. Crosson*, 460 U.S. 1037, 103 S.Ct. 1426, 75 L.Ed.2d 787 (1983). A complaint must allege facts sufficiently setting forth the essential elements of the cause of action. *Lucien v. Preiner*, 967 F.2d 1166, 1168 (7th Cir.1992), *cert. denied*, 506 U.S. 893, 113 S.Ct. 267, 121 L.Ed.2d 196 (1992), *In re Handy Andy Home Improvement Ctrs., Inc.*, 1997 WL 268354 at *2 (Bankr.N.D.Ill. 1997).

A complaint alleging fraud must meet a heightened pleading standard. A plaintiff

pursuing a claim of fraud must state with particularity the circumstances constituting the fraud. FED.R.CIV.P. 9(b). The Seventh Circuit has held that Rule 9(b), as incorporated through Bankruptcy Rule 7009, requires a plaintiff alleging fraud in a complaint to state "the who, what, when, and where of the alleged fraud." *Uni\*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 923 (7th Cir.1992).

### B. Summary Judgment

The purpose of summary judgment under Federal Rule of Civil Procedure 56 is to avoid unnecessary trials when there is no genuine issue of material fact in dispute. *Farries v. Stanadyne/Chicago Division,* 832 F.2d 374, 378 (7th Cir.1987); *Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav. & Loan Assoc. of Indianapolis,* 806 F.2d 146, 149 (7th Cir. 1986). Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Matsushita Elect. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Trautvetter v. Quick,* 916 F.2d 1140, 1147 (7th Cir.1990). The existence of factual disputes is sufficient to deny summary judgment only if the disputed facts are outcome determinative. *Jones Truck Lines, Inc. v. Republic Tobacco, Inc.,* 178 B.R. 999, 1003 (Bankr. N.D.Ill.1995). The burden is on the moving party to show that there is no such factual dispute. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552; *Matsushita,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56; *In re Chicago, Missouri & Western Ry. Co.,* 156 B.R. 567 (Bankr.N.D.Ill.1993). This burden is met when the record, as a whole, does not lead a rational trier of fact to find for the non-moving party. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby,* 477 U.S. 242, 249–250, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (citations omitted). The respondent may not rest upon mere allegations or denials in its pleadings. *Id.*

## V. DISCUSSION

### A. Green's Motion to Exclude All Medical Information Not Within the Four Corners of the Contract in Contest

Green asks the Court to exclude his medical records because the "[r]elease is defective in that it carries no date." Green's request will be denied for two reasons.

■ First, Green's assertion that the Release is undated is incorrect. The Release bears the date December, 1993. Green's failure to fill in the day of the month does not invalidate his signature giving consent. Secondly, even if the Release were invalid, Green completed a second release in the Supplemental Application, which he signed and fully dated on December 24, 1993.

■ In addition, LifeUSA had the right to obtain and use Green's medical records under the Illinois Mental Health and Developmental Disability Confidentiality Act (the "Confidentiality Act"), 740 ILCS 110/1 *et seq.* Section 10 of the Confidentiality Act provides that a recipient of mental health services has the privilege to refuse to disclose and to prevent the disclosure of the recipient's record or communications. 740 ILCS 110/10(a). Section 10 then further provides ten exceptions to this rule. One exception is that the recipient's records may be disclosed in proceedings involving the validity of or benefits under a life insurance policy if the recipient's mental condition or treatment and services in connection with it is a material part of the claim or defense of any party. 740 ILCS 110/10(a)(7).

Section 10(b) limits the exceptions provided in Section 10(a). It allows any party to the proceeding to request an *in camera* review of the records before disclosure. 740 ILCS 110/10(b). On July 27, 1999, in open court, Green waived his right to an *in camera* inspection of his medical records and the records received from the VA. The Court entered an order to that effect on August 3, 1999.

LifeUSA discovered and obtained evidence that Green had falsely answered Questions 4 and 5 of the Application and Questions 1–3 of the Supplemental Application. In response to Question 4 of the Application, completed in December, 1993, Green stated that he had not been treated by any physician within the past five years. Israel's letters and deposition testimony make it clear that Green had been treated for depression and anxiety. The VA's records make clear that Green had been hospitalized six times during the period in question and that during the entire period, he had collected substantial disability benefits from the VA based on a diagnosis of paranoid schizophrenia. LifeUSA challenges the validity of the Policy and Rider and seeks the return of premiums waived. Green's mental condition and treatment history are the very bases for LifeUSA's claim and are also the bases for its defense to Green's Counterclaim. This proceeding falls squarely within the exception to confidentiality provided by Section 10(a)(7) of the Confidentiality Act. Green's Motion to Exclude Medical Records accordingly must be denied.

### B. LifeUSA's Motion for Summary Judgment

In its motion for summary judgment, LifeUSA asks the Court to enter summary judgment in its favor on its Amended Complaint and to declare that the Policy and the Rider are rescinded and void.

 The victim of a fraud may elect one of two remedies. He may choose to keep the benefit of his bargain, leaving the contract in place and recovering damages for his injuries. *Bell & Howell Financial Services Co. v. St. Louis Pre–Sort, Inc.*, No. 97 C 6063, 1999 WL 965961, at *5 (N.D.Ill. Sept. 29, 1999). In the alternative, he may elect rescission and restitution. *Id.* The injured party may seek, but not obtain, both remedies; entry of final judgment granting one remedy precludes the award of the other. *Lempa v. Finkel*, 278 Ill.App.3d 417, 424, 663 N.E.2d 158, 215 Ill.Dec. 408 (1996) ("The prosecution of one remedial right to judgment or decree constitutes an election barring subsequent prosecution of inconsistent remedial rights.") *Id.* Rescission plus damages would amount to double recovery for a single injury. *Bell & Howell*, 1999 WL 965961 at *4.

#### 1. Rescission of the Policy and Rider

LifeUSA did not request rescission of either the Policy or the Rider in its Amended Complaint. It sought only a determination that Green's debts to it were nondischargeable. However, once Green filed his counterclaim, LifeUSA filed a response which requested rescission or, in the alternative, a finding that the Policy was deemed rejected. "Every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." Fed.R.Civ.P. 54(c).

 The Court "may grant the remedy of rescission where there has been some fraud in the making of a contract, such as an untrue statement or the concealment of a material fact, or where one party enters into a contract reasonably relying on the other party's innocent misrepresentation of a material fact." *Puskar v. Hughes*, 179 Ill.App.3d 522, 528, 533 N.E.2d 962, 966, 127 Ill.Dec. 880, 884 (1989). The remedy of rescission cancels the contract at issue and returns the parties to their original, pre-contract status. *Time Savers, Inc. v. Star Leasing Co.*, No. 96 C 5670, 1998 WL 67603, at *9 (N.D.Ill.

Feb. 10, 1998); *Puskar*, 179 Ill.App.3d at 528, 127 Ill.Dec. 880, 533 N.E.2d 962. The party seeking rescission must restore the other party to his pre-contract position. *Time Savers*, 1998 WL 67603 at *9; *Puskar*, 179 Ill.App.3d at 528, 127 Ill.Dec. 880, 533 N.E.2d 962. One may not rescind a contract without returning to the other party all consideration received for it. *Fleming v. U.S. Postal Service AMF*, 27 F.3d 259, 260 (7th Cir.1994). The principle that a contract can be rescinded only upon a tender of any consideration received is a general principle of contract law. *Id.* citing SAMUEL WILLISTON, 12 WILLISTON ON CONTRACTS § 1460 (Walter H.E. Jaeger ed., 3d ed.1970). "An offer to return consideration is a condition precedent to the exercise of the right to rescind an agreement." *Peoples Marketing Corp. v. Hackman*, 347 F.2d 398, 400 (7th Cir.1965). This rule applies even in cases of fraud or misrepresentation. *Puskar*, 179 Ill.App.3d at 528, 127 Ill.Dec. 880, 533 N.E.2d 962. However, the duty to return the consideration received does not arise until the court orders rescission. *Roston Investments, Etc. v. Opus Corp.*, No. 90 C 2524, 1990 WL 139140, at *3 (N.D.Ill. Sept. 13, 1990).

The State of Illinois limits the common law of contract rescission when applied to life insurance agreements. In Illinois, an insurer has only two years from the date of a life insurance policy in which to seek rescission for any reason other than non-payment. Section 224(c) of the Illinois Insurance Code, 215 ILCS 5/1 *et seq.*, pertaining to Legal Reserve Life Insurance, provides in part:

> [T]he policy, together with the application therefor, a copy of which shall be endorsed upon or attached to the policy and made a part thereof, shall constitute the entire contract between the parties and . . . after it has been in force during the lifetime of the insured a specified time, not later than 2 years from its date, it shall be incontestable except for nonpayment of premiums. . . .

215 ILCS 5/224(c).

The facts surrounding Green's application for both the Policy and the Rider are the same. However, the facts surrounding LifeUSA's efforts to rescind first the Rider and later, both the Rider and the Policy, are different and dictate different outcomes.[5]

*a. The Policy*

 LifeUSA first sought to rescind the Policy in its answer to Green's counterclaim, dated September 30, 1998. It did not seek rescission of the Policy in its Circuit Court Rescission Complaint; it sought rescission of the Rider only. Nor, as discussed at the beginning of this section,[6] did LifeUSA seek to rescind the Policy in its Amended Complaint.

---

**5.** Neither party has raised the issue of whether an insurer may rescind a rider without rescinding the supporting policy or *vice versa*. In consideration of Green's *pro se* status, the Court has researched the issue independently and has not discovered any case directly on point. One court, without any discussion of this question, has allowed rescission of riders, issued after the date of the policy, to a disability policy that had become incontestable due to the insured's fraud. *Oglesby v. Penn Mutual Life Ins. Co.*, 877 F.Supp. 872 (D.Del.1994). As a general rule, when an insurance policy covers two separately valued risks (in this case, the risk of Green's death under the Policy and the risk of Green's total disability under the Rider) insured for separately valued amounts (in the event of Green's death or upon the Policy's maturity date, LifeUSA was to pay in excess of one million dollars and in the event of Green's disability, LifeUSA was to waive premiums) and conditioned upon payment of separate premiums, the policy is divisible and if the insured has paid the premium for one for one risk and not the other, the insurer may cancel the policy only for the unpaid risk. *See*, Lee R. Russ & Thomas F. Segalla, COUCH ON INSURANCE § 30:4, pp. 30-7–9 (3d ed.1997) (discussing partial cancellation of insurance policies). Because the Policy and the Rider cover separate risks valued at separate amounts and conditioned upon payment of separate premiums, LifeUSA may rescind the Rider even though it cannot rescind the Policy.

**6.** *See supra* p. 198.

LifeUSA now seeks to rescind the Policy because of Green's misrepresentations about his health and medical history. It first asked the Court for rescission on September 30, 1998. The Policy, dated February 23, 1994, had then been in force for more than four years. The Policy was then and is now incontestable by operation of Section 224 of the Illinois Insurance Code, 215 ILCS 5/224(c). It has been incontestable since February 23, 1996. LifeUSA may not rescind the Policy because of fraud.

*b. The Rider*

LifeUSA may rescind the Rider if it establishes that Green obtained the Rider by fraud. In its Rescission Complaint in the Circuit Court, LifeUSA prayed that "the waiver of planned premium rider be rescinded and declared void...." In Paragraph 13 of the Rescission Complaint, LifeUSA stated that "Plaintiff hereby tenders to defendant all premiums paid for said waiver in the total amount of One Thousand, Three Hundred Eighty–Nine Dolars [sic] and $^{98}/_{100}$ ($1,389.96), plus legal interest on such premiums." LifeUSA filed the Rescission Complaint on February 22, 1996, one day within the two-year limit set by the statute.

Section 154 of the Illinois Insurance Code, 215 ILCS 5/154, governs the circumstances under which LifeUSA may rescind an insurance policy obtained by misrepresentations or false warranties. Section 154 provides in pertinent part:

No misrepresentation or false warranty made by the insured or in his behalf in the negotiation for a policy of insurance, or breach of a condition of such policy shall defeat or avoid the policy or prevent its attaching unless such misrepresentation, false warranty · or condition shall have been stated in the policy or endorsement or rider attached thereto, or in the written application therefor. No such misrepresentation or false warranty shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or materially af-

fects either the acceptance of the risk or the hazard assumed by the company. 215 ILCS 5/154.

Thus, LifeUSA must show: (1) that the Application contains a misrepresentation made by Green or on Green's behalf and (2) that the misrepresentation was made with the intent to deceive or materially affected the risk accepted by LifeUSA. *Methodist Medical Center· of Illinois v. American Medical Security, Inc.,* 38 F.3d 316, 319 (7th Cir. 1994). An applicant for an insurance policy has a duty to act in good faith towards the proposed insurer and to "make a complete and truthful disclosure of all relevant information so that the insurer may determine whether the applicant meets the insurer's underwriting criteria," *New England Mutual Life Ins. Co. v. Bank of Illinois in DuPage,* 994 F.Supp. 970, 976 (N.D.Ill.1998). A material misrepresentation will avoid coverage, even if it is made through mistake or in good faith. *Methodist Medical,* 38 F.3d at 320.

A misrepresentation in an application for insurance is "a statement of something as a fact which is untrue and affects the risk undertaken by the insurer." *Methodist Medical,* 38 F.3d at 319, quoting *Northern Life Ins. Co. v. Ippolito Real Estate Partnership,* 234 Ill.App.3d 792, 801, 601 N.E.2d 773, 779, 176 Ill.Dec. 75, 81 (1992). Incomplete answers and failure to disclose material information may constitute misrepresentation when the insurer cannot accurately assess its risk without the omitted information. *Methodist Medical,* 38 F.3d at 320.

There can be no question that Green's Application and Supplemental Application contained misrepresentations. LifeUSA asked whether Green had consulted or been treated by a physician within the past five years; Green replied that he had not. LifeUSA asked whether Green had ever had or been told he had a nervous or mental condition; Green replied that he had not. Green further told LifeUSA that

he had never consulted a doctor for or been treated for mental illness; that he had never applied for or received disability benefits; and that, within the past five years, he had never consulted a medical practitioner for any reason. Yet, as of December, 1993, Green had received monthly disability benefits from the VA since at least 1989 and still was receiving them. He received these benefits for disabling paranoid schizophrenia. One month after completing the Application and Supplemental Application, Green asked the VA to increase his benefit level from 70% to 100%, based on a series of hospitalizations that had taken place over the previous five years, the very five years that LifeUSA had asked about. In that application, Green asserted that he had been disabled for the past twenty-five years. Israel's records, deposition testimony, and correspondence indicate that, while Green sometimes consulted Israel about his practice, Green also received psychotherapy from Israel from 1985 until 1994. Israel wrote a letter to the VA discussing Green's paranoia and depression in 1991, well within the five years LifeUSA asked about in some questions.

From the circumstances, the Court must infer that Green intended to deceive LifeUSA. Green wanted LifeUSA to issue both an insurance policy worth more than one million dollars and the Rider waiving premiums on the Policy; he omitted significant portions of his medical and disability history to get them.

 Nor is there any question that Green's misrepresentations were material. A misrepresentation is material if a reasonably careful and intelligent person would believe that the omitted facts substantially increased the insurer's risk under the policy and might cause the insurer to reject the application. *Methodist Medical*, 38 F.3d at 320. Materiality may be established by testimony of the insurer or its representative. *Id.* Summary judg-

ment is appropriate where the misrepresentation is "of such a nature that no one would dispute its materiality." *Id.* No one can dispute that an assertion of life-long perfect health by someone actually suffering from Green's illnesses is not material.[7]

LifeUSA's prayer for rescission of the Rider is granted. The Rider is rescinded and declared void. LifeUSA must restore Green to his original, pre-contract position by returning to Green the benefits it received from him. Life USA must refund the premiums paid for the Rider.

*2. The Effect on the Policy of 11 U.S.C. § 365*

 The Court's decision that the Policy is incontestable pursuant to 215 ILCS 5/224(c) does not entirely dispose of questions about the Policy. Although LifeUSA may not rescind the Policy, there is still an issue as to whether the Policy remains in effect at present. Section 365 of the Bankruptcy Code provides in pertinent part:

(a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

. . . .

(d)(1) In a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract ... within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such contract ... is deemed rejected.

(2) In a case under chapter ... 13 of this title, the trustee may assume or reject an executory contract ... at any time before the confirmation of a plan, but the court, on the request of any party to such contract ... may order the trustee to determine within a speci-

---

7. LifeUSA's representative has also filed an affidavit that LifeUSA would not have issued the Policy to Green if it had known his true medical history.

fied period of time whether to assume or reject such contract or lease.

11 U.S.C. § 365.

The Bankruptcy Code does not define the term "executory contract." The Seventh Circuit has stated that "[f]or purposes of the Bankruptcy Code, an executory contract is one in which the obligations of each party remain substantially unperformed." *In re C & S Grain Co., Inc.*, 47 F.3d 233, 237 (7th Cir.1995).

Green's obligation to LifeUSA under the Policy, to pay premiums as they came due, was substantially unperformed; the Policy's maturity date was February 23, 2043. LifeUSA's obligation to Green, to pay benefits in the event of a legitimate claim, was also substantially unperformed. The Policy was an executory contract subject to the provisions of § 365 when Green filed his petition for relief in bankruptcy.[8]

Green's bankruptcy estate had two chances to assume the Policy and failed to do so. He filed his petition for relief under Chapter 13 of the Bankruptcy Code, thus triggering the provisions of § 365(d)(2) on the filing date. He was represented by counsel in the bankruptcy proceeding. He could have assumed the Policy at any point in time between October 22, 1997, the petition date, and March 10, 1998, the date on which the case was converted to a Chapter 7. He did not.

Section 348(c) of the Bankruptcy Code, which outlines the effects of conversion, then allowed the Chapter 7 trustee sixty days from the date of conversion in which to assume the Policy. The trustee did not assume the Policy. The Policy is deemed rejected under § 365(d)(1) as of May 8, 1998, sixty days from the date of the conversion.

### 3. LifeUSA's Amended Complaint

In its Amended Complaint, LifeUSA seeks a determination that it has a nondischargeable claim for waived premiums under 11 U.S.C. § 523(a)(2)(A). LifeUSA also seeks a determination that the sanction ordered by the Circuit Court is nondischargeable pursuant to 11 U.S.C. § 523(a)(6).[9]

The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Selfreliance Fed. Credit Union v. Harasymiw (In re Harasymiw)*, 895 F.2d 1170, 1172 (7th Cir. 1990); *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 961 (Bankr.N.D.Ill. 1995). To further the policy of providing a debtor a fresh start in bankruptcy, "exceptions to discharge are to be construed strictly against a creditor and liberally in favor of a debtor." *Goldberg Secs., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir.1992) (quoting *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir.1985)).

---

**8.** In Count I of his Second Amended Counterclaim, Green alleges that LifeUSA breached the contract for life insurance before Green filed his bankruptcy petition. Green has not argued that a contract is no longer executory once it has been breached; however, the Court itself researched this point because of Green's *pro se* status. Where a party has breached a contract prepetition, the possibility arises that the contract may no longer be executory for purposes of § 365. *In re C & S Grain Co., Inc.*, 47 F.3d 233, 237 (7th Cir. 1995). However, not every prepetition breach defeats a contract's executory status. *Software Customizer, Inc. v. Bullet Jet Charter, Inc. (In re Bullet Jet Charter, Inc.)*, 177 B.R. 593, 600 (Bankr.N.D.Ill.1995). The breach must be so material that the contract is at an end; the other party no longer has a duty to perform. *C & S Grain*, 47 F.3d at 237. "A

distinction must be made between a contract breached pre-petition and a contract terminated pre-petition under applicable non-bankruptcy law." *Software Customizer, Inc. v. Bullet Jet Charter, Inc. (In re Bullet Jet Charter, Inc.)*, 177 B.R. 593, 600 (Bankr.N.D.Ill. 1995). A mere breach without termination does not change a contract's executory status for purposes of § 365. Green has never argued that the Policy was terminated; rather the gist of his argument is that the Policy is still fully in force and effective. Thus, his allegations of breach do not affect the executory status of the Policy as of his petition date.

**9.** LifeUSA has drafted its Amended Complaint in only one count. For the sake of clarity, the Court will discuss its two claims separately.

### a. LifeUSA's Claim Under § 523(a)(2)(A)

 LifeUSA seeks a declaration that the debt Green owes for premiums waived under the Rider is nondischargeable pursuant to § 523(a)(2)(A). Section 523(a)(2)(A) provides:

(1) A discharge under section 727 … does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A). To prevail on a complaint to determine dischargeability under § 523(a)(2)(A), a plaintiff must establish several elements. The plaintiff must show that the debtor obtained money, property, services, or an extension, renewal or refinancing of credit from it by making representations which the debtor either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentation. *Scarlata*, 979 F.2d at 525; *see also, Mayer v. Spanel International Ltd.*, 51 F.3d 670, 673–74 (7th Cir.1995) (discussing the elements of a claim under § 523(a)(2)(A)). The plaintiff must also show that the debtor acted with an intent to deceive. *Scarlata*, 979 F.2d at 525. Finally, the plaintiff must show that it justifiably relied on the debtor's false statements to its detriment. *Field v. Mans*, 516 U.S. 59, 72, 74–75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

LifeUSA has already established that Green made intentional and fraudulent misrepresentations upon which it actually relied by issuing the Policy. For purposes of § 523(a)(2)(A), LifeUSA must also establish that its reliance was justifiable.

 Justifiable reliance is an intermediate level of reliance; it is less than reasonable reliance, but more than mere reliance in fact. *Field*, 516 U.S. at 74–75, 116 S.Ct. 437. The justifiable reliance standard imposes no duty to investigate unless the falsity of the representation is apparent upon a cursory glance. *Id.* at 70, 77, 116 S.Ct. 437; *Golant v. Care Comm, Inc.*, 216 B.R. 248, 254 (N.D.Ill.1997); *AT & T Universal Card Services v. Alvi (In re Alvi)*, 191 B.R. 724, 730 (Bankr.N.D.Ill. 1996). There is no duty to investigate unless the recipient of a false statement is capable of appreciating its falsity at the time by the use of his senses. *Field*, 516 U.S. at 71, 116 S.Ct. 437, quoting RESTATEMENT (SECOND) OF TORTS § 541 cmt. a.

There is nothing about the Application or the Supplemental Application that should have put LifeUSA on alert. On its face, the documents are perfectly unexceptional. They have been properly filled out and signed by both the proposed insured (Green) and the insurance agent (Bloomfield). Green affirmed that the statements contained therein were true. LifeUSA knew nothing about Green that should cause it to investigate him more fully before issuing the Policy to him. Upon a cursory glance, Green was a healthy man in his mid-forties, practicing psychology in the city of Chicago, who wanted to buy insurance. Absolutely nothing about the Application or the Supplemental Application indicates that Green's representations of health were false and that he had a long and complex medical history. LifeUSA justifiably relied on Green's misrepresentations.

 However, LifeUSA has not established that Green's fraud damaged it in any way that would require nondischargeability under § 523(a)(2)(A). Before § 523(a)(2)(A) applies, the debtor's fraud must result in a loss of property to the creditor. 4 COLLIER ON BANKRUPTCY ¶ 523.08(1)(a), pp. 523–41–42 (15th ed. rev. 1998).

While Green may owe a debt for unpaid premiums,[10] LifeUSA has not lost any property. It merely kept the Policy in existence. LifeUSA did not make any payments to Green for claims on the Policy. According to Green, LifeUSA rejected his attempts to surrender the Policy for cash or to borrow against it. LifeUSA has not incurred any loss on the Policy and Green has gained no tangible benefit.

LifeUSA has nothing more than an unsecured claim for insurance premiums. The debt is fully dischargeable under § 523(a)(2)(A). Summary judgment will be entered in favor of Green on LifeUSA's claim under this section. His debt for insurance premiums for the period from August, 1994 through May 8, 1998, is discharged in bankruptcy.

*b. LifeUSA's Claim Under § 523(a)(6)*

 Section 523(a)(6) provides that a debt for "willful and malicious injury by the debtor to another entity or to the property of another entity" is nondischargeable in bankruptcy. 11 U.S.C. § 523(a)(6). The Supreme Court has held that § 523(a)(6) applies only to those acts "done with the actual intent to cause injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61–63, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998). Debts arising from recklessly or negligently inflicted injuries are dischargeable under § 523(a)(6). *Id.*, 118 S.Ct. at 978.

Relying on an opinion written before *Kawaauhau*, LifeUSA mistakenly argues that a creditor seeking a determination of nondischargeability need not prove that the debtor intended to cause harm. LifeUSA neither alleges nor offers evidence that Green intended to harm it by ripping up his records and the Circuit Court's order makes no such finding. Rather, the Circuit Court wrote that Green "should have known that his conduct ... would at the very least, cause some detriment, inconvenience and additional labor to the plaintiffs." "Should have known" language is generally associated with a negligence standard. *See, e.g., Brown v. M & M/Mars*, 883 F.2d 505, 512 (7th Cir.1989) (ruling that a "should have known" instruction was insufficient to support even a finding of recklessness).

LifeUSA has also failed to connect its damages to Green's actions. It has merely submitted to the Court a copy of the Circuit Court's order for fees and costs. It has neither alleged that those fees and costs resulted from Green's behavior nor alleged that Green's conduct caused it to be damaged. The $8,601.14 debt for sanctions will be discharged. Summary judgment is entered in favor of Green on this claim.

**B. Green's Motion for Summary Judgment and Motion to Dismiss**

Green's Second Amended Counterclaim will be dismissed without prejudice due to lack of subject matter jurisdiction. Therefore, the Court will deny Green's Motion for Summary Judgment on his Second Amended Counterclaim.

For reasons already stated, the Court grants Green's motion for summary judgment on LifeUSA's Amended Complaint. Green's motion to dismiss those claims is denied.

**VI. CONCLUSION**

Green's Motion to Exclude All Medical Information Not Within the Four Corners of the Contract is denied.

Green's Second Amended Counterclaim is dismissed without prejudice for lack of subject matter jurisdiction.

LifeUSA's Motion for Summary Judgment is granted in part and denied in part. The Rider is rescinded and void. Due to that rescission, LifeUSA must refund to

---

**10.** The Court will not decide whether a debt for merely maintaining the existence of an insurance policy, on which the insurer has not paid any claims, is a debt for services or credit. The debt in this case is clearly not a debt for money or property, as neither passed from LifeUSA to Green.

Green the premiums paid for the rescinded Rider. LifeUSA cannot rescind the Policy; it became incontestable except for nonpayment of premiums on February 23, 1996. However, the Policy is deemed rejected under § 365(d)(1) as of May 8, 1998.

LifeUSA's motion for summary judgment on its claim under § 523(a)(2)(A) is denied. LifeUSA has not established that it suffered damages that would make Green's debt for unpaid insurance premiums nondischargeable under § 523(a)(2)(A). Green's debt for life insurance premiums is discharged in bankruptcy.

LifeUSA's motion for summary judgment on its claim under § 523(a)(6) is denied. The debt that Green owes to LifeUSA, in the amount of $8,601.14 for sanctions awarded by the Circuit Court, is discharged in bankruptcy.

Green's motion to dismiss LifeUSA's Amended Complaint is denied. Green's motion for summary judgment on LifeUSA's Amended Complaint is granted. Green's motion for summary judgment is otherwise denied.